**Nazareth GATES et al.**
**and**
**United States of America,**
**Plaintiff-Intervenor,**

v.

**John COLLIER et al.**
**No. GC 71-6-K.**

United States District Court,
N. D. Mississippi,
Greenville Division.

Sept. 13, 1972.

Judgment Oct. 20, 1972.

Roy S. Haber, Jackson, Miss., for plaintiffs.

H. M. Ray, U. S. Atty., Oxford, Miss., Jesse Queen, Michael Davidson, Tom Sheron, Department of Justice, Washington, D. C., for plaintiff-intervenor.

A. F. Summer, Atty. Gen., Jackson, Miss., P. Roger Googe, Jr., William A. Allain, Jesse Adams, Asst. Attys. Gen., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRELIMINARY STATEMENT

KEADY, Chief Judge.

This case of great public concern and interest involves alleged unconstitutional conditions and practices in the maintenance, operation, and administration of the Mississippi State Penitentiary at Parchman, Mississippi (Parchman).

The action began February 8, 1971, as a class action brought by certain Parch-man inmates against the Superintendent of the Penitentiary, the members of the Mississippi Penitentiary Board and the Governor of the State. Thomas D. Cook, penitentiary superintendent at the commencement of the action, was replaced in February 1972 by John Collier, who has been substituted in his stead as a defendant. Invoking federal court jurisdiction under 28 U.S.C. §§ 1331 and 1343, the plaintiffs allege that the defendants, by their methods of prison administration, have deprived the inmates of rights, privileges and immunities secured to them by the First, Eighth, Thirteenth and Fourteenth Amendments and by 42 U.S.C. §§ 1981, 1983, 1985 and 1994. The complaint also charge that negro inmates have been segregated and discriminated against on the basis of their race in violation of the Equal Protection Clause of the Fourteenth Amendment.[1] The complaint seeks injunctive relief to remedy the alleged misconduct of the defendants and a declaratory judgment that the continuation of certain practices and conditions at the penitentiary is unconstitutional.

On August 23, 1971, the United States was allowed to intervene as plaintiff pursuant to 42 U.S.C. § 2000h-2.[2] The complaint in intervention alleges that the defendants have, contrary to the Fourteenth Amendment, maintained a system of prison facilities segregated by race; and, additionally, the defendants have failed to provide the inmates with adequate housing, medical care, and protection from assault from other prisoners; that the conditions of the sewerage disposal and water systems create an imme-

[1] At an early date the court made a Rule 23 determination that the action is maintainable as a class action. There are in fact two classes of plaintiffs. One class consists of all persons incarcerated at Parchman claiming deprivation of a broad range of rights. The second class consists of all black inmates who, in addition to claiming the same deprivations as the first class, claim racial discrimination and segregation. Both classes, however, will be considered as one unless the context requires otherwise.

[2] "Whenever an action has been commenced in any court of the United States seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race, color, religion, or national origin, the Attorney General for or in the name of the United States may intervene in such action upon timely application if the Attorney General certifies that the case is of general public importance. In such action the United States shall be entitled to the same relief as if it had instituted the action."

diate health hazard, and that prison officials have permitted the custodial staff, including inadequately trained armed trusties, to inflict cruel and unusual punishment upon inmates in violation of the Eighth Amendment. The United States seeks injunctive relief to remedy the alleged misconduct of defendants.

The parties have conducted extensive pre-trial discovery consisting of depositions, interrogatories and answers, interviews, inspections and investigations carried on at Parchman by attorneys, penologists, FBI agents, legislators and other interested persons. After pre-trial conferences, the case was set for full evidentiary hearing on May 15, 1972. By agreement of counsel for all parties, however, the introduction of oral evidence and further testimony in open court was waived and the case submitted to the court for decision upon the pleadings, stipulations, depositions, interrogatories and answers, offers of proof, factual summaries, proposed trial plans, evidentiary synopses, photographs, reports and other documentary evidence. In this manner a multitude of materials has been admitted as evidence, without objection; and these materials constitute the basis upon which the court makes its findings of fact and conclusions of law as follows:

## FINDINGS OF FACT

1. Established in the year 1903, Parchman is the sole state prison for the State of Mississippi and is located in the Delta region of the state. The main area, comprising approximately 16,000 acres, is located in Sunflower County near Drew. A smaller area is located in Quitman County in the vicinity of Lambert. Parchman is and has always been operated essentially as a farm devoted to the growing of cotton, soybeans and other crops as well as the production of livestock, swine, poultry and the operation of a dairy. In recent years vocational training for certain trades has been established.

2. The Penitentiary Board, composed of 5 persons appointed by the Governor with consent of the Senate for 4-year terms, appoints the prison superintendent, who, by statute, is vested with the exclusive management and control of the prison system in all aspects, including the care and treatment of inmates and the hiring, control and discharge of approximately 150 civilian employees. Miss.Code Ann. §§ 7924, 7930 and 7932 (1971 Supp.).

3. There are approximately 1900 inmates at Parchman, of which 50 are women; and two-thirds of the total prison population is black. The prison itself consists of 21 units, 12 of which are the major residential camps with permanent population. All of the units are located at Parchman except (a) the Governor's mansion, which is in Jackson; (b) Mississippi State Hospital, which is located at Whitfield approximately 140 miles from Parchman; and (c) Camp B, which is located near Lambert. Seven camps have no permanent population because inmates are assigned only temporarily to them, viz: Maximum Security Unit (MSU), Hospital, Dairy, Camp 3 (Pre-release Center), Camp 7 (Psychiatric Camp), Camp 9 (Diagnostic and Reception Center), and Whitfield (Mississippi State Hospital). Two separate facilities exist for women, i. e., Women's Camp and Women's Pre-release Center.

4. All persons who are convicted of a felony and sentenced to a prison term by the state courts of Mississippi are confined at Parchman or at Whitfield. Miss. Code Ann. § 7922. MSU also houses a number of pre-trial detainees who have been sent by court order to Parchman for safekeeping. All inmates, except those confined to MSU, are housed in barracks or dormitories.

5. Four civilians, or "free-world" personnel, are stationed at each of the 12 residential camps. There is a sergeant who is in charge of and responsible for the security and welfare of his camp and its inmates. Two employees, known as drivers, are assigned to most of the camps for the purpose of taking inmates to and from field work. The remaining civilian is employed as night watchman.

6. While the sergeants, drivers and night watchmen have general supervisory responsibility over the inmates, the practice at Parchman is that, as former Superintendent Cook described it: "The inmates do the guarding of other inmates." Under the system in use certain inmates, described as "trusties", "hallboys", "floorwalkers" and "cage bosses" (whose selection and responsibilities are described more fully below) perform custodial and supervisory duties over the rest of the inmates, and in some cases trusties are armed for the performance of their duties.

## RACIAL DISCRIMINATION

7. The policy and practice at Parchman has been and is to maintain a system of prison facilities segregated by race, and by which the black inmates are subjected to disparate and unequal treatment. Approximately twice the number of blacks are required to live in the same amount of dormitory space as white inmates. Inmates are assigned to the 12 major residential camps on the basis of race. Inmates are assigned to work details according to race. Blacks have not been afforded the same vocational training opportunities as have the white inmates. Prison officials maintain separate files for black and white inmates and make work and housing assignments therefrom. Although inmates of both races are housed in the same buildings at the prison hospital and women's camps, they are nevertheless placed in separate, segregated wings. Black inmates in some instances have been subjected to greater punishment or more severe discipline than have white inmates for similar infractions of penitentiary rules. Historically, Parchman employees have been only of the white race and not until recent months have any blacks been employed as civilian personnel. At the time the record was closed, only two blacks were employed.

## PHYSICAL FACILITIES

8. The housing units at Parchman are unfit for human habitation under any modern concept of decency. The facilities at all camps for the disposal of human and other waste are shockingly inadequate and present an immediate health hazard. Open sewage is a breeding ground for rats and other vermin. As recently reported by the State Board of Health: "A new sewage system is the most pressing environmental need now existing at the Penitentiary." The entire waste disposal system has been condemned by state health and pollution agencies. All of the 14 water systems have one or more deficiencies needing attention or improvement; 8 of the systems have major defects which present a potentiality for dangerous contamination. Water, contaminated as a result of the inadequate sewerage system, has caused the spread of infectious diseases. At most camps the amount of water available for drinking and sanitation is approximately half enough for inmate personnel. As reported by the State Board of Health February 10, 1972: "The water supply facilities at Mississippi State Penitentiary were found to be inadequate and obsolete . . . to protect the health of the inmates and employees at Mississippi State Penitentiary. The need for a new water system is almost as great as the need for a sewer system."

9. The building facilities at most camps, "are in a deplorable state of maintenance and repair," as reported by the Mississippi Joint Legislative Committee January 4, 1971, and result in sub-human conditions. The electric wiring at a majority of the units is frayed, exposed and generally in a bad state of repair, presenting safety hazards to the inmates. Heating facilities are inadequate to heat the inhabited areas; many broken windows at the camps are stuffed with rags to keep out the cold, wind and rain. Bathroom facilities for the inmates at the different camps for basic hygiene are, as a rule, inadequate in number and poorly maintained. According to Mr. Cook, the number and quality of operable commodes, showers, soap containers and other hygienic necessities are inadequate

at most camps. For example, at Camp B, there are three wash basins for 80 men which consist of oil drums cut in half. Kitchen facilities and food service are below par. By any standard of decency, the physical facilities are woefully inadequate and far below minimal requirements. Indeed, the photographic evidence depicts filthy bathrooms and barracks, dead rats near the barracks, and mattresses, purchased second-hand, which are old, dirty and in bad repair. At most camps there is also a lack of adequate fire-fighting equipment at the housing units, making it, as stated by Mr. Cook, "almost impossible to put out a fire at Parchman with the present water system and the present fire-fighting equipment."

10. The facilities for housing, sheltering and caring for inmates at the great majority of the camps are in severe need of maintenance and repair, if not replacement, because the present conditions are hazardous to the health and safety of human beings. Many of these gross deficiencies are of long standing and are the result of public and official apathy and neglect for the fundamental needs of persons incarcerated for crime. Although in recent years certain physical improvements have been made, notably by the establishment of pre-release centers for men and women, the living conditions provided for the inmates at the various camps are generally deplorable and subhuman.

## MEDICAL FACILITIES

11. The medical staff and available facilities at Parchman fail to provide adequate medical care for the inmate population, with the result that many inmates have not received prompt or efficient medical examination, treatment or medication. Until recently only one physician was employed at Parchman; inmates have been relied upon to perform important medical functions for which they are not qualified. The hospital is still without many items of equipment needed to treat emergencies. Unsanitary conditions, particularly in the T. B. ward,

prevail in and nearby the hospital. Some inmates with serious contagious diseases are allowed to mingle with the general prison population; other inmates have developed complications from lack of medical treatment. Administration practices tend to discourage inmates from seeking needed medical assistance. For example, some of the sergeants regularly punish inmates by sending them to MSU after an examination by a physician does not reveal any obvious injury; and Superintendent Collier's announced policy is to threaten an inmate with loss of selling plasma, good time or visiting privileges if he unnecessarily requests aid of a doctor.

## INADEQUATE PROTECTION OF IN-MATES

12. All of the inmates, except those who are in MSU, are housed in buildings at the various camps which have two separate wings and contain barracks known as "cages", one for regular inmates called "gunmen" and the other for trusties. On the gunmen side the inmates are placed in one large room where they are assigned to bunks. Certain risks to inmates are created by the large number of inmates thus confined in each barrack; and the risks inherent in such confinement have been increased by the presence of the following conditions:

(a) Defendants have failed to properly classify and assign inmates to barracks, resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes.

(b) The assignment of substantial custodial responsibility to inmates who serve as hallboys, floorwalkers and cage bosses. These inmates are selected by the sergeant and are untrained for their duties. Hallboys perform administrative duties such as distributing medicine, delivering mail and maintaining inmate skeleton files. Floorwalkers are nontrusties who perform custodial duties both during daytime and nighttime and on whose recommendation inmates may

be punished. Cage bosses are charged with the duty of enforcing discipline and maintaining peace in the barracks both day and night. The evidence is replete with instances of inhumanities, illegal conduct and other indignities visited by inmates who exercise authority over their fellow prisoners.

(c) Although many inmates possess knives or other handmade weapons, there is no established requirement or procedure for conducting shakedowns to discover such weapons, nor is possession of weapons reported or punished. At least 85 instances are revealed by the record where inmates have been physically assaulted by other inmates. Twenty-seven of these assaults involved armed attacks in which an inmate was either stabbed, cut or shot.

(d) Admittedly the civilian guards assigned to the camps are insufficient in number to maintain control over the inmates. The one civilian watchman who is assigned to each camp is prohibited by penitentiary rules from entering the cages. As stated by Mr. Cook, penitentiary employees have no control over inmates after the lights are turned out and "there is no way that anyone can guard the safety of an inmate in the Parchman situation" because of the dormitory type system and the lack of free world personnel to guard and protect inmates. In some cases, supervisory personnel have allowed inmates to fight, gamble and acquire liquor and drugs in violation of prison rules and state law.

(e) The operation of the armed trusty system as explained in the two succeeding paragraphs.

## PARCHMAN'S TRUSTY SYSTEM

13. The primary duties of guarding other inmates are performed by trusties who are selected by the sergeants without the use of objective criteria or uniform standards. Payoffs, favoritism, extortion and participation in illegal activities have influenced the process of recommending and selecting trusties. The trusties who are armed, referred to as "trusty shooters", perform the guard duties at every camp and facility within the confines of the penitentiary, except at the outer gates. The trusty shooters number approximately 150 and they are stationed at each camp in numbers that vary from 20 to 30. While no written rules prohibit the arming of civilian employees, they do not ordinarily carry firearms. Instead, armed trusties are used to guard and oversee the inmates while working in the fields and on occasions the trusties are left in sole charge of the fields.

14. Penitentiary records indicate that many of the armed trusties have been convicted of violent crimes, and that of the armed trusties serving as of April 1, 1971, 35% had not been psychologically tested, 40% of those tested were found to be retarded, and 71% of those tested were found to have personality disorders. There is no formal program at Parchman for training trusties and they are instructed to maintain discipline by shooting at inmates who get out of the gun line; in many cases, trusties have received little training in the handling of firearms. Inmates have, on many occasions, suffered injuries and abuses as a result of the failure to select, train, supervise and maintain an adequate custodial staff. Trusties have abused their position to engage in loan-sharking, extortion and other illegal conduct in dealing with inmates subject to their authority and control. The evidence indicates that the use of trusties who exercise authority over fellow inmates has established intolerable patterns of physical mistreatment. For example, during the Cook administration, 30 inmates received gunshot wounds, an additional 29 inmates were shot at, and 52 inmates physically beaten.

## DISCIPLINARY RULES, PUNISHMENT AND PROCEDURE

15. The penitentiary superintendent has statutory authority to prescribe rules regarding the discipline of prisoners. His authority is limited in only three respects: (a) Any prisoner placed in solitary confinement upon the superin-

tendent's order shall be fed a meal at least once each day and be examined by a physician at least once every two days; (b) no prisoner shall be placed in the "dark hole" of MSU for longer than 24 hours; and (c) corporal punishment is limited to the use of the lash (not exceeding seven licks), which may be administered only upon the written order of the superintendent in the presence of any two of the following persons: the superintendent, the chaplain or a member of the penitentiary board, Miss.Code Ann. § 7968. The statute also prescribes that whenever a sergeant or other official considers it necessary for a prisoner to be punished, he must make a written report to the superintendent, stating the offense committed by the inmate, and the superintendent is required to investigate before ordering corporal punishment. Notwithstanding these statutory limitations, penitentiary superintendents at Parchman have frequently approved or acquiesced in punishments that exceed or fail to comply with these limitations imposed by state law.

16. MSU is a separate building with four wings, one portion of which is known as the "permanent side" where there are confined in solitary cells those inmates who are dangerous to others or have escape records or are sent to Parchman by court order for special safekeeping, or those formerly in death row awaiting execution. The other section of MSU is referred to as the "punishment side" where inmates found guilty of violating prison rules are sent for varying lengths of time. Each wing in MSU contains 13 cells, each of which is approximately 8' x 10' in size. The individual cells are equipped for use by two men, with double metal bunks, lavatory and commode. In addition, each side has one 6' x 6' cell, known as the dark hole, with no lights, commode, sink or other furnishings. A hole in the concrete floor is located in the middle of the cell and is approximately 6" in diameter that will flush to dispose of body wastes. A heavy metal door with no window closes the cell.

17. Mr. Cook defended the use of the dark hole as a necessary type of psychological punishment for inmates who are obstreperous, obstinate violators of penitentiary discipline, and favored that method in preference to inflicting corporal punishment by the lash. When this action was begun, however, the practice was to place inmates in the dark hole naked, without any hygienic materials, and often without adequate food. It was customary to cut the hair of an inmate confined in the dark hole by means of heavy-duty clippers described by inmates as sheep shears, which in some cases resulted in injury. Under the present practice inmates have frequently been kept in the dark hole for 48 hours and may be confined therein for up to 72 hours. While an inmate occupies the dark hole, the cell is not cleaned, nor is the inmate permitted to wash himself.

18. Although Superintendents Cook and Collier have issued instructions prohibiting mistreatment in the enforcement of discipline, the record is replete with innumerable instances of physical brutality and abuse in disciplining inmates who are sent to MSU. These include administering milk of magnesia as a form of punishment, stripping inmates of their clothes, turning the fan on inmates while naked and wet, depriving inmates of mattresses, hygienic materials and adequate food, handcuffing inmates to the fence and to cells for long periods of time, shooting at and around inmates to keep them standing or lying in the yard at MSU, and using a cattle prod to keep inmates standing or moving while at MSU. Indeed, the superintendents and other prison officials acquiesced in these punishment procedures.

19. Prior to November 1970, inmates were punished summarily in accordance with the recommendations of the camp sergeant and without adherence to any clearly defined procedure. Mr. Cook in November 1970 established a "trial council" and authorized it to handle disciplinary actions against inmates. By this procedure, the camp sergeant is

directed to prepare a written report of the prison rule violation and deliver it to the security officer for distribution to the trial council, a group composed of three civilian penitentiary employees. The trial council is required to interview the inmate at MSU, to consider information supplied by the inmate and, if necessary investigate the complaint at the camp from which the inmate has come to determine whether the inmate is guilty of the offense charged. The trial council, if it determines guilt, is directed to assess appropriate punishment, which may not be imposed without approval by the superintendent or the assistant superintendent. The practices of the trial council, since its establishment, reveal the following:

(a) The inmate is not notified of the charge either orally or in writing prior to the time of the interview by the trial council.

(b) While an inmate is given an opportunity to respond orally to the charge, he is not permitted to present witnesses in his behalf or to confront and cross-examine adverse witnesses.

(c) The sergeant's written report need not identify anyone with personal knowledge of the information reported and is often made without either personal knowledge or investigation by the sergeant.

(d) In proceedings before the trial council, the inmate does not have available the assistance of a representative, and no transcript of any kind is made of the interview.

(e) Where an inmate denies or contradicts the report, the word of the reporting sergeant is generally accepted. Only on very rare occasions, approximately 1% of the cases, does the trial council make any independent investigation.

(f) The punishment recommendation made by the reporting sergeant is usually approved by both the trial council and the superintendent.

(g) Punishments imposed have not been uniform but frequently varied for similar infractions, and sometimes without regard to whether the offense was one of a minor or major nature.

20. Although the rules require all offenses to be heard by the trial council, inmates have been punished without a hearing, not only for conduct which is not listed in the charges but for conduct which is not a violation of prison rules.

MAIL CENSORSHIP

21. Until the eve of trial, the practice at Parchman was to censor all incoming and outgoing mail of inmates. Mr. Cook defended this practice as necessary for the prison's security. The custom was to delegate responsibility of censorship of mail to the camp sergeant; and at some of the camps the sergeants delegated to their wives or to the drivers the censoring of inmates' mail. During the course of this case, the court issued an order prohibiting censorship of mail sent to plaintiffs' counsel. On May 5, 1972, Mr. Collier issued a memorandum on correspondence privileges in which he advised that there would be no censorship of incoming or outgoing mail, that there would be no limit to letters an inmate may write except where limitation may be imposed as a matter of discipline, and that incoming mail will be opened in the presence of the inmate only to determine whether money is contained therein.

NOTORIETY OF CONDITIONS

22. The noted conditions, practices and procedures at Parchman have been the subject of investigation and critical comment in past years by committees of the Mississippi Legislature, public officials, and a study team from the University of Georgia. Comprehensive reports of such findings were last submitted to the Mississippi Legislature in 1971. As a result, the Legislature authorized and directed the penitentiary board (a) to prepare a plan to bring about limited centralization of facilities for improving the security of the inmates, and (b) to phase out the existing agricultural camp units coinci-

dent with the elimination of the trusty guard system (Miss.Code Ann. § 7926.5 approved April 20, 1971), and to eliminate trusty guards by July 1, 1974 (§ 7965). While the superintendent is permitted until that date to use "a reasonable number of deserving and trustworthy inmates . . . to guard inmates and to supervise their prison work details," the penitentiary board was authorized to eliminate the trusty system at an earlier date if feasible and consistent with consolidation procedures outlined in § 7926.5. More recently a consultant committee engaged by the Mississippi State Planning Agency, the Law Enforcement Assistance Administration (LEAA), and the American Correctional Association reviewed conditions at Parchman and made an interim report thereon.[3] This committee concluded that present conditions at Parchman are "philosophically, psychologically, physically, racially and morally intolerable." The committee found that Parchman has been operated and continues to be operated in accordance with three fundamental principles that must be eliminated to correct gross deficiencies in the prison's administration, viz: (1) The prison system must operate at a profit at any cost; (2) Armed inmate guards are acceptable and capable of insuring safety and security within the system; and (3) Security and control of inmates are insured through maintaining a high degree of fear within the inmate population. The evidence sustains the conclusions of the consultant committee.

## ASSISTANCE FROM LEAA

23. During pre-trial conferences, this court was advised of the recommendations made by the consultant committee for the expenditure of $1 million to take emergency steps toward meeting fundamental human needs of the inmate population as well as for long-range planning. These direly needed expenditures are summarized in the margin.[4] The court was further advised by the Administrator of LEAA, United States Department of Justice, that, upon prompt application by state officials, LEAA discretionary funds of $1 million would be made available to alleviate the most pressing adverse conditions at Parchman based upon the findings of the consultant committee. The Administrator of LEAA further represented that he would appoint a three-man planning group to develop, in conjunction with state officials, a long-range plan for improvement of all aspects of the prison's facilities and operations. At these conferences the Governor of the State also made known his concern for rectifying conditions at Parchman and

---

3. This committee was composed of Paltiel J. Bach, Architect, National Clearinghouse for Criminal Justice Planning and Architecture, University of Illinois; Winston E. Moore, Executive Director, Cook County Department of Corrections, Chicago; John H. Moran, Director of Division of Adult Corrections of the State of Delaware; Kenneth L. Poole, National Clearinghouse for Criminal Justice Planning and Architecture, Urban, Illinois; Robert Sarver, former Commissioner of Corrections in West Virginia and Little Rock, Arkansas; and Harry H. Woodward, Jr., President, World Correctional Service Center for Community and Social Concerns, Inc., Chicago.

4. General Renovation of Living Quarters:

| | | |
|---|---|---|
| a. | Sanitation | $108,260 |
| b. | Sewage Treatment | 378,000 |
| c. | Illumination | 76,300 |
| d. | Electrical | 51,000 |
| e. | General Building Repairs | 41,150 |
| Rodent and Pest Control: | | 10,000 |
| General Inmate Welfare: | | |
| a. | Personal Hygiene Needs | 27,953 |
| b. | Recreation Equipment | 15,000 |
| c. | Medical Services | 5,000 |
| Personnel: | | |
| a. | Inmate Safety & Security Personnel | 196,440 |
| b. | Construction & Maintenance Personnel | 22,000 |
| c. | Food Service Personnel | 22,000 |
| d. | Insurance Premiums— Personnel | 2,232 |
| Equipment: | | |
| a. | Inmate Security Equipment | 19,665 |
| Planning: | | |
| a. | Long Range Planning | 25,000 |
| | Total Proposed Budget | $1,000,000 |

gave assurances that he would strongly advocate to the Mississippi Legislature that it provide adequate legislation and funds not only to eliminate the undesirable conditions at Parchman but to make it an exemplary penal institution.

## CONCLUSIONS OF LAW

■■ Because of the federal claims, this court has jurisdiction of this case. 28 U.S.C. §§ 1331(a) and 1343(3) and (4). Our pendent jurisdiction is not limited to federal questions but extends to questions of state law that arise out of the same operative facts.

■ As the Supreme Court said recently: "Federal Courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons' which include prisoners. We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition the Government for redress of grievances. . . ." Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263, 267 (1972). Although this federal district court is reluctant to interfere with the internal operation and administration of a prison, Sinclair v. Henderson, 435 F.2d 125 (5 Cir. 1970), the clear fact is that Parchman, in certain material respects, has been, and continues to be, maintained and operated in a manner violative of rights secured to inmates by the United States Constitution, and also contrary to Mississippi law.

■■ The defendants' policy of segregating inmates by race, unrelated to prison security and discipline, is in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Washington v. Lee, 263 F.Supp. 327 (M.D.Ala. 1966), aff'd. 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). The Equal Protection Clause also prohibits racial discrimination in the administration of Parchman. Owens v. Brierley, 452 F.2d 640 (3 Cir. 1971); Tilden v. Pate, 390 F.2d 614 (7 Cir. 1968); and Rivers v. Royster, 360 F.2d 592 (4 Cir. 1966).

■■ The prohibition against cruel and unusual punishment contained in the Eighth Amendment is applicable to the State of Mississippi through the Due Process Clause of the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). It is established that the Eighth Amendment does not have a fixed and settled connotation, for the Supreme Court has declared that the "Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). We subscribe to what the Eighth Circuit has said:

> "In summary, then, so far as the Supreme Court cases are concerned, we have a flat recognition that the limits of the Eighth Amendment's proscription are not easily or exactly defined, and we also have clear indications that the applicable standards are flexible, that disproportion, both among punishments and between punishment and crime, is a factor to be considered, and that broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable." Jackson v. Bishop, 404 F.2d 571, 579 (8 Cir. 1968).

■■ The prohibition of the Eighth Amendment is not limited to specific acts directed at selected individuals but is equally applicable to general conditions of confinement that may prevail at a prison. While confinement, even at hard labor and without compensation, is not necessarily cruel and unusual punishment, it may be so when the conditions and practices become "so bad as to be shocking to the conscience of reasonably civilized people even though a particular inmate may never personally be subject to any disciplinary action." Holt v. Sarver, 309 F.Supp. 362, 373 (E.D.Ark.1970), aff'd. 442 F.2d 304 (8 Cir. 1971); Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971).

 We hold that confinement of inmates at Parchman in barracks unfit for human habitation and in conditions that threaten their physical health and safety, by reason of gross deficiencies in plant and equipment and lack of adequate medical staff and facilities, is impermissible. Not only are the inmates thus deprived of their constitutionally protected right to adequate provision for their physical health and well-being, they are denied proper care, treatment and feeding (Miss.Code § 7930), wholesome food prepared under sanitary conditions (§ 7942) and efficient hospital and medical services (§ 7959) required by state law. The deprivation of basic human needs for housing, food and medical care is not merely unnecessarily cruel and unusual, but is calculated to retard, if not prevent, the process of a prisoner's rehabilitation.

 It is the obligation of penitentiary officials to insure that inmates are not subjected to any punishment beyond that which is necessary for the orderly administration of the prison. Sinclair v. Henderson, 435 F.2d 125 (5 Cir. 1970). The defendants have subjected the inmate population at Parchman to cruel and unusual punishment by failing to provide adequate protection against physical assaults, abuses, indignities and cruelties of other inmates, by placing excessive numbers of inmates in barracks without adequate classification or supervision, and by assigning custodial responsibility to incompetent and untrained inmates. When the trusty system is used to place in the hands of inmates weapons or other form of control over the inmate population, and prison officials either cannot or fail to prevent the arbitrary infliction by the trusties of physical and economic injury upon their fellow inmates, the system must be condemned as unconstitutional. Indeed, the Mississippi statutes do not contemplate for guard duty the use of trusties who are corrupt, venal, incompetent, or dangerous. As maintained at Parchman, the trusty system, which allows inmates to exercise unchecked authority over other inmates, is patently impermissible.

 Prison officials have the duty to maintain discipline among inmates and to that end may impose reasonable sanctions as punishment. In determining what types of punishment are reasonable, courts "must look to the extant law and the general practices of our society. Otherwise, we [judges] run the risk of imposing our own personal moral code on a perhaps unready society." Novak v. Beto, 453 F.2d 661, 665 (5 Cir. 1971). The maintenance of order and discipline among criminals is often a problem for the most dedicated and conscientious prison administrator. It is a well-established principle that solitary confinement, as a mode of punishment, is not per se cruel and unusual, nor is it made so because the inmate, while so confined, may be deprived of privileges and given limited bedding and minimal food if under watchful supervision of competent personnel. Solitary confinement may, however, result in cruel and unusual punishment if carried out in a manner that is "foul", "inhuman" and "violative of [the] basic concepts of [human] decency." Trop v. Dulles, supra; Wright v. McMann, 387 F.2d 519 (2 Cir. 1967). Thus, in cases where solitary confinement practices have been held to constitute cruel and unusual punishment, inmates have been deprived of the basic elements of hygiene, or have been placed on starvation diet for indeterminate periods of time, or have been subjected to other brutal or dehumanizing practices in the course of their solitary confinement. The court holds that Parchman inmates have been subjected to constitutionally forbidden cruel and unusual punishment when they have been confined in MSU's dark hole cells naked, without any hygienic materials, bedding, adequate food or heat, and also without opportunity for cleaning either themselves or the cell, and for longer than 24 hours continuously. When the dark hole is used at the penitentiary, it must be under conditions that comport with human decency. This standard is man-

dated by both the Eighth Amendment and Mississippi's statutes which express strong humanitarian concern in the discipline of prisoners. Also, whether inflicted at MSU, at the camps, or elsewhere on the penitentiary premises, corporal punishment, especially when of such severity as to offend contemporary concepts of decency and human dignity, is violative of the Eighth Amendment. Indeed, state law, § 7968, expressly discourages corporal punishment of any kind, and forbids it except upon express written order of the superintendent. A fair reading of § 7968 makes it illegal for any prison official other than the superintendent to order corporal punishment; and where corporal punishment is expressly authorized by the superintendent, it is limited to the whip or lash, which is not to be used for more than 7 licks. While the evidence indicates, commendably, that the lash has not been used at Parchman since 1965, other forms of corporal punishment banned by state law and offensive to present-day concepts of decency and human dignity have been practiced, and to an unconstitutional degree. Plaintiffs contend that this court should enjoin the use of the lash and the dark hole under all circumstances. This court is, however, without power to restrain, on the ground of unconstitutionality, the enforcement of punishment expressly authorized by the state statute without convening a three-judge court as required by 28 U.S.C. § 2281. Accordingly, no present ruling thereon may be made.

 It is established law that the Due Process Clause of the Fourteenth Amendment requires that inmates be afforded certain procedural rights before disciplinary sanctions may be imposed by prison officials. Landman v. Royster, supra; Sostre v. McGinnis, 442 F.2d 178 (2 Cir. 1971); Nolan v. Scafati, 430 F.2d 548 (1 Cir. 1970); Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971). While federal courts have not been in agreement as to the exact procedure constitutionally mandated in the area, at the least minimal standards of procedural due process must be observed. "While all the procedural safeguards provided citizens charged with a crime obviously cannot and need not be provided to prison inmates charged with violation of a prison disciplinary rule, some assurances of elemental fairness are essential when substantial individual interests are at stake." Nolan v. Scafati, supra, 430 F.2d at 550. This court has no hesitation in holding that at least three procedural safeguards are constitutionally required by the Due Process Clause, viz:

(a) There must be rules and regulations officially promulgated by prison authorities and communicated to the prisoner apprising him of what conduct can subject him to serious discipline, what penalty he can expect and the procedure by which such determination will be made.

(b) The prisoner must be given official written notice of the specific charge against him prior to hearing.

(c) The inmate must be afforded an opportunity to be heard in a hearing to be conducted by an impartial tribunal.

We hold that the punishment procedures at Parchman fail to comport with these minimal requirements of due process, and the defendants shall be required to implement their procedure by incorporating such requirements. Until the implementation of such procedure and an opportunity afforded to judge the adequacy of the new procedure, the court declines to rule on plaintiffs' contentions that Fourteenth Amendment requirements also include the availability of counsel or counsel-substitute, the opportunity to cross-examine accusers, the opportunity to present additional evidence, and a formal review procedure.

 Although the exact scope of a prisoner's right to uncensored correspondence is yet to be defined, courts have discarded the traditional notion which endorsed absolute restrictions on an inmate's use of the mails as

necessarily incident to incarceration. Recent decisions have reflected an especial vigilance to protect an inmate's right of access to the courts, public officials, and his counsel of record in order to challenge the legality of his conviction or the condition of his imprisonment. Sostre v. McGinnis, supra; Conklin v. Hancock, 334 F.Supp. 1119 (D.N.H.1971); Marsh v. Moore, 325 F.Supp. 392 (D. Mass.1971); Meola v. Fitzpatrick, 322 F.Supp. 878 (D.Mass.1971); Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970); Carothers v. Follette, 314 F. Supp. 1014 (S.D.N.Y.1970). Accordingly, "any prison regulation or practice which restricts the [First Amendment] right of free expression that a prisoner would have enjoyed if he had not been imprisoned must be related both reasonably, and necessarily, to the advancement of some justifiable purpose of imprisonment." (Citations omitted). Carothers v. Follette, supra at 1024.

■ Despite the recent adoption of somewhat generous rules abolishing censorship and governing prisoner correspondence effective May 5, 1972, we are convinced from the evidence that the arbitrary censorship and suppression of inmate mail unrelated to legitimate needs for security, rehabilitation, or orderly prison administration has long been the accepted practice at Parchman. Total censorship may not be imposed at the whim of prison officials. The present correspondence rules at Parchman apparently do not contemplate a need sufficiently compelling to justify opening outgoing inmate mail addressed to "officers of the federal, state, and local courts, all federal officials, all state officials, all officials of the Mississippi State Penitentiary administrative staff and letters to the Probation and Parole Board." Such correspondence is classified as privileged and will not be opened. Applying the same reasoning, we hold that there is no justifiable reason for not considering an inmate's outgoing correspondence to his attorney of record to be likewise privileged. Other classes of outgoing mail, however, may be screened to detect escape attempts or other illegal activity. There may be a justifiable need to inspect incoming mail from any source (including correspondence to inmates ostensibly from courts, public officials, agencies and his counsel) in order to discover drugs, weapons, or other contraband; in addition, incoming mail may be read to frustrate escape plans or other illegal activity.

■ We hold that an inmate's right to send and receive correspondence to courts, public officials and his attorney of record may be impeded only to the limited extent of inspecting incoming mail from these sources as herein prescribed. No justifiable reason exists to curtail inmates' First and Sixth Amendment rights to send and receive mail of this important character. The right to send and receive other classes of mail, however, may be limited or restricted as a legitimate disciplinary measure.

Innumerable inmate petitions complaining of conditions and practices at Parchman have been filed in this cause since its commencement. The court reserves for future determination all issues which are not controlled and disposed of by the foregoing findings of fact and conclusions of law.

## WITHHOLDING ENTRY OF ORDER ON SCOPE OF RELIEF PENDING CONFERENCE

■ The court has the duty of fashioning a decree that will require defendants to eliminate the conditions and practices at Parchman hereinabove found to be violative of the United States Constitution and, to some extent, contrary to Mississippi law. Our task is to safeguard the rights of inmates without otherwise intruding upon the responsibility of defendants to manage and operate the penitentiary. It appears that certain relief may be granted without delay. Such relief includes: (a) Prohibiting the arbitrary and unjustified censorship and suppression of mail; (b) requiring the adoption and use of administrative procedures to administer discipline that

comports with due process; (c) prohibiting corporal punishment, where it is of such severity to offend the modern concepts of human dignity; and (d) requiring that confinement at MSU cells be carried out under conditions agreeable to state law and without the imposition of cruel and unusual punishment. In other areas of relief the court realizes that both substantial funds and reasonable time will be necessary to accomplish the significant improvement program needed to eliminate unconstitutional conditions. This is especially true as to housing and other basic physical facilities. The defendants claim that various improvements at Parchman have been made in recent months and that even more progress is now possible with the availability of the LEAA grant of $1 million. Nevertheless, the state must move to bring all aspects of the penitentiary operation in conformity with constitutional principles if it is to continue the use of Parchman as a place of incarceration of criminals, and this court is obliged to make certain that such steps are not only begun with reasonable promptitude but are fully carried out. Under the circumstances, the court believes that the ends of justice would be best served by reserving the entry of its judgment until conference is had with counsel for inmate plaintiffs, the United States as plaintiff-intervenor, and defendant state officials. Said conference is hereby scheduled for October 16, 1972, at 9 o'clock, a. m., in the United States Courthouse at Greenville, Mississippi, and it shall be open to the public with opportunity for interested state and federal officials to express their views as to the implementation of plans with specific time-tables to satisfy legal standards as hereinabove set forth. Counsel are directed to make written submissions to the court touching the matters listed in the agenda, and serve copy thereof upon all other counsel not later than October 10, 1972, concurrently with filing the original with the clerk of this court. Counsel shall be prepared at the conference to discuss with the court the following agenda:

(a) The terms of a proposed injunctive order to:

(1) Prohibit the arbitrary and unjustified censorship and suppression of mail.

(2) Require the adoption and use of administrative procedures to administer discipline comporting with due process.

(3) Prohibit corporal punishment of inmates, where it is of such severity as to offend the modern concepts of human dignity.

(4) Require that confinement at MSU cells be carried out under conditions agreeable to state law and without the imposition of cruel and unusual punishment as prohibited by the Eighth Amendment.

The foregoing relief should become effective within ten days from the date of the judgment to be entered by the court.

(b) The elimination of racial segregation and discrimination at Parchman, as speedily as possible. The court shall be advised as to those camps and facilities which are presently desegregated, problems which may exist for desegregating the remaining units, and obstacles which may prevent the elimination of all other racially discriminatory practices in the operation of the penitentiary.

(c) The securing of adequate medical staff, procedures, equipment and supplies, in accordance with standards of adequacy determined by the Mississippi Commission on Hospital Care as to the Parchman hospital, and by the American Correctional Association as to the medical, nursing and dental staff, procedures, equipment and supplies.

(d) A system or method of classifying and assigning inmates to camps or barracks so as to avoid housing inmates convicted of aggravated violent crimes with those who are first offenders or convicted of non-violent crimes.

(e) Adequate protection to inmates while confined in the barracks, including the assignment of additional employees to the cages and means for controlling the

acquisition and possession of weapons by inmates.

(f) A plan for upgrading and improving the physical facilities at Parchman, which shall consist of two parts:

(1) Matters relating to interim, emergency problems such as upgrading to minimally adequate conditions buildings, water, electrical and sewage facilities in line with the recommendations of the consultant committee; and

(2) Matters relating to long-range programs to renovate and reconstruct the physical plant where necessary, including the centralization of prison facilities as directed by the state legislature.

(g) A plan for the rapid elimination of the trusty system as presently existing at Parchman and conversion to a system of civilian guards, including provision in the interim for using competent trusties strictly in accordance with adequate training and supervision. To the extent civilian guards or other civilian employees are required, the plan should set forth the means of hiring, training and financing such personnel.

(h) Allowance to counsel for inmate plaintiffs of a reasonable attorney's fee and reimbursement of expenses for successful prosecution of the action.

(i) Other matters appropriate for inclusion in the judgment to be entered by the court.

(j) Provision for the court's continuing jurisdiction over the case for approval of all plans and periodic reports on the steps taken in implementation thereof.

## JUDGMENT

In conformity with Findings of Fact and Conclusions of Law heretofore made and after conferring with counsel of record and interested state and federal officials respecting appropriate relief grantable by the court; it is

Ordered

That the defendants, Mississippi State Penitentiary Board, the Superintendent of the Penitentiary, and the Governor of the State, their successors, agents, servants, employees and all persons acting in concert with them, be and they are hereby commanded and enjoined from performing, causing to be performed or permitting to continue acts, practices and conditions found to exist in connection with the maintenance, operation and administration of the Mississippi State Penitentiary at Parchman, Mississippi, in violation of the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. More specifically, this injunctive order is in two parts, to-wit: (1) immediate and intermediate relief; and (2) long-range relief.

## IMMEDIATE AND INTERMEDIATE RELIEF

### CENSORSHIP OF INMATE MAIL

(1) Said defendants, and all persons in privity with them, shall not open or otherwise interfere with any outgoing mail of inmates addressed to:

(a) Officials of the federal, state and local courts;

(b) All federal officials including the President of the United States, any senator or congressman, and officials of any United States agency or department; all state officials including the Governor, members of the state Senate and House of Representatives and officials of any state agency or department;

(c) All members and employees of the State Probation and Parole Board;

(d) The attorney of record of an inmate in any pending action, civil or criminal, in any duly constituted local, state or federal court.

(2) Said defendants, and all persons in privity with them, are prohibited from interfering with outgoing mail of inmates to any other addressee except to open and inspect, in the presence of the inmate, any letter where prison officials

have reasonable grounds to suspect such communication is an attempt to formulate, devise or otherwise effectuate a plan to escape from the penitentiary, or to violate the laws of the State of Mississippi or of the United States.

(3) The defendants, and all persons in privity with them, are prohibited from interfering with incoming mail from any source except to open and inspect such mail, in the presence of the inmate addressee, whenever the prison officials have reasonable grounds to suspect escape attempts or to discover drugs, weapons or other material expressly prohibited by state or federal laws or by prison rules.

(4) There shall be no restriction placed on the number of letters that an inmate may write to the addressees listed in (1) above. Reasonable limitations may be imposed upon all other classes of mail as an approriate disciplinary measure pursuant to published prison rules.

(5) During the period of time that this court retains jurisdiction of the cause, any change in censorship rules at the penitentiary not in conformity with the foregoing shall be submitted in writing, filed with the clerk of this court and copies served on all counsel of record at least 10 days before the effective date of any such change. No changes shall be implemented until they receive the specific approval of this court.

(6) This order relating to mail censorship shall displace and supersede this court's interim order directing that certain inmate mail addressed to the Lawyers Committee for Civil Rights Under Law at Jackson, Mississippi, be processed through the United States Magistrate at Greenville.

## DISCIPLINE OF INMATES

(7) Until approval of new penitentiary rules as provided in paragraph (8) hereof, defendants, and all persons in privity with them, are enjoined from imposing any form of disciplinary punishment upon inmates except under the following terms and conditions:

(a) An inmate may not be punished except for conduct which violates an existing penitentiary rule or regulation.

(b) Any inmate accused of infraction of an existing penitentiary rule or regulation shall be given written notice of the charge against him, which notice shall identify the prison rule alleged to have been violated and be served upon the accused at least 24 hours prior to the hearing.

(c) The accused must be afforded an opportunity to appear before a tribunal to respond to the charge. In no event shall the person bringing the charge serve on the disciplinary tribunal which conducts the hearing.

(8) It is further ordered that defendants not later than November 20, 1972, shall compile comprehensive rules and regulations governing inmate conduct which are sufficiently clear and definite to apprise inmates of:

(a) Conduct which constitutes a breach of discipline;

(b) The penalties and sanctions which may be imposed for such conduct;

(c) A complete statement of the procedure by which such determination shall be made.

Such rules and regulations shall be filed with the clerk of this court and copies concurrently served upon counsel of record for the plaintiffs and plaintiff-intervenor. Upon their approval by the court, defendants shall forthwith supply to each inmate at the penitentiary a printed copy of said rules and regulations, post a printed copy of same in a conspicuous place at each camp and institute a procedure for full explanation of said rules and regulations to inmates who may be illiterate or not capable of understanding the printed copy.

## CORPORAL PUNISHMENT

(9) Until further order of this court, the defendants, and all persons in privity with them, are enjoined and prohib-

ited from imposing any form of corporal punishment of such severity as to offend present-day concepts of decency and human dignity. Specifically, defendants are enjoined from punishing inmates by methods previously used at the penitentiary and found by this court to be excessive, including but not limited to:

(a) Beating;

(b) Shooting;

(c) Administering milk of magnesia;

(d) Stripping inmates of their clothes;

(e) Turning fans on inmates while they are naked and wet;

(f) Depriving inmates of mattresses, hygienic materials and/or adequate food;

(g) Handcuffing or otherwise binding inmates to fences, bars, or other fixtures;

(h) Using a cattle prod to keep inmates standing or moving at Maximum Security Unit (MSU) or elsewhere;

(i) Shooting at or around inmates to keep them standing or moving while at MSU;

(j) Forcing inmates to stand, sit or lie on crates, stumps or otherwise maintain awkward positions for prolonged periods.

Defendants shall have authority to prescribe specific punishment and means for administering such punishment consistent with the institutional rules and regulations for inmate discipline adopted as provided in paragraph (8) above. In addition, prison officials shall have authority to take immediate necessary action without excessive force to prevent acts of violence or destruction or escape attempts or to restore order. Where such necessary action is taken, there shall be made a complete report, stating the names of all inmates involved in the occurrence, the names of officials and other persons present at the time of the occurrence, with a detailed statement of the events made by the officer present and in charge. Such report shall be based upon the personal knowledge of witnesses. Until further notice, copies of all such reports of necessary action shall be sent to the court with copies to attorneys for plaintiffs and plaintiff-intervenor within 3 days after the occurrence of such incident.

DISCIPLINARY CONFINEMENT

10. Defendants, and persons in privity with them, are further enjoined from confining any inmate in disciplinary segregation or isolation at MSU or elsewhere, including "dark hole" cells, except under the following conditions:

(a) The inmates so confined shall receive the same daily ration of food which is provided to the general prison population, and in no event shall such inmates receive less than 2000 calories per day;

(b) The inmates shall be permitted to wear normal institutional clothing unless the prison physician orders otherwise for a particular inmate;

(c) The inmates so confined shall be supplied with soap, towels, toothbrush and shaving utensils;

(d) All disciplinary cells shall be equipped with adequate bedding, including mattresses, clean sheets and blankets. Adequate bedding may be withheld only if an inmate misuses or destroys such supplies;

(e) All disciplinary cells shall be adequately heated, ventilated and maintained in a sanitary condition at all times;

(f) No inmate shall be confined in any isolation cell referred to as a dark hole for a period in excess of 24 hours.

ELIMINATION OF RACIAL DISCRIMINATION AND SEGREGATION

11. Except as hereinafter provided for the desegregation of inmate housing facilities, said defendants, and all persons in privity with them, are hereby

enjoined from engaging, or continuing to engage, in racially discriminatory practices and procedures of any nature in the operation or administration of the penitentiary, including racial discrimination in recruiting, selecting and hiring of staff, guards and other civilian personnel, discrimination in assigning inmates to work details, discrimination in providing vocational educational training, or in any other practice or procedure which effectuates disparity in treatment of prisoners because of race. Recognizing that immediate desegregation of all inmate housing facilities cannot be feasibly accomplished, the court directs that defendants, not later than December 20, 1972, shall submit to the court a comprehensive plan for the orderly desegregation of all inmate facilities, including all barracks, camps and other areas of habitation. The plan to be submitted by defendants shall, consistent with prison security, provide for the total elimination of all segregated inmate facilities within 4 months from the date of the submission of said plan, but in no event later than April 20, 1973. No delay in the full implementation of the desegregation plan will be entertained by the court in the absence of imperative reasons. The aforesaid plan shall be filed with the clerk of this court not later than December 20, 1972, and copies thereof concurrently served upon counsel of record for plaintiffs and plaintiff-intervenor.

## MEDICAL FACILITIES

12. The defendants are commanded and enjoined to meet minimal health care requirements for inmates and civilian personnel at the penitentiary. Specifically, to that end, defendants shall employ, and continue to employ at all times until the further order of this court, such additional medical personnel as necessary so that the prison's medical staff shall consist of at least 3 full-time physicians, 2 full-time dentists, 2 full-time trained physican assistants, 6 full-time nurses certified as RN or LPN, 1 medical records librarian, and 2 medical cler-

ical personnel. No inmate shall be utilized to fill a position in the above described civilian medical staff; however, nothing herein shall be construed to discourage the utilization of trained and competent inmate personnel to supplement the minimal civilian medical staff necessary for adequate health care. Provided, however, that no inmate personnel shall have access to drugs or medical records of other inmates. Defendants shall also provide that the medical facility at the penitentiary have available on a regular basis the consultant services of a qualified radiologist and pharmacist. Defendants shall use their best efforts to comply with the general standards of the American Correctional Association relating to medical services for prisoners.

Defendants are further directed to take all steps necessary to have the prison hospital and equipment brought into compliance with state licensing requirements for a hospital and infirmary, including adequate housing and treatment for tubercular patients and the chronically ill needing convalescent care.

No inmate shall be required to waive any right or privilege as a prerequisite to seeking medical attention, nor shall he be punished unless the Superintendent makes an express finding that a particular inmate seeks medical care unnecessarily and for malingering purposes.

## CLASSIFICATION AND ASSIGNMENT OF INMATES

13. Defendants also shall, not later than December 20, 1972, file with the court a proposed program for the classification and assignment of all inmates taking into account special circumstances, viz:

(a) The necessity for the early desegregation of the penitentiary;

(b) The necessity of alterations and additions to existing facilities to provide adequate inmate protection;

(c) The interest of the penitentiary officials in implementing additional honor camps.

Said program of classification and assignment shall be racially nondiscriminatory, shall contemplate modern methods conforming generally with classification standards of the American Correctional Association, and shall provide for its full effectuation within 4 months from the date of the submission, but in no event later than April 20, 1973; provided, however, that the court may grant reasonable extensions of time for good cause shown because of special exigencies. The court bears in mind that defendants have $40,000 of LEAA funds presently available for study of such a program and the United States Bureau of Prisons has agreed to provide technical assistance. Because of the basic importance of inmate classification and assignment and the limited housing facilities presently available, the penitentiary superintendent shall be under a duty to consult with the sheriffs and circuit judges of the State as to the necessity for sending pre-trial detainees to the penitentiary and avoid such overcrowding of MSU as may frustrate his firm duty to comply with the order of this court to properly classify and assign convicted felons.

## INMATE PROTECTION

14. Defendants, and all persons in privity with them, are hereby enjoined and commanded to increase the protection of inmates from the assaults of fellow inmates. Specifically, they shall forthwith place into effect the following procedures at each of the camps and other areas of inmate habitation:

(a) Reduce, by appropriate temporary means, the overcrowding of inmates in a single room or barracks. This can be accomplished by placing wire or other dividers in such manner as the prison officials may determine;

(b) Institute methods to prevent and detect the acquisition, retention and use of weapons by inmates;

(c) Assign three civilian guards to each barracks during night hours and relieve cage bosses, hallboys and floorwalkers of all custodial responsibilities, including searches and shakedowns of fellow inmates;

(d) Assign civilian guards to do field duty and relieve armed trusties of that responsibility;

(e) Prohibit strictly all gambling and fights between inmates at all camps and in other prison areas, and insist upon punishment of offenders for breach of penitentiary rules relating thereto.

(f) Report promptly to the County Prosecuting Attorney of Sunflower County all cases of inmate assault or other violence;

(g) Make reasonable efforts to isolate inmates who have a record of assault and violence on other inmates.

15. The above requirements are regarded as interim measures within the capability of defendants to carry out promptly but in no event later than December 20, 1972. The court is aware that greater improvement in the degree of protection accorded to inmates may well depend upon modification of existing structures or the building of new and additional facilities and the fulfullment of a proper classification and assignment system. Defendants shall, however, submit not later than December 20, 1972, a report to the court outlining all interim procedures taken to increase the protection of inmates from assaults of fellow inmates.

## ELIMINATION OF SHOOTER TRUSTIES AND OTHER TRUSTIES PERFORMING CUSTODIAL DUTIES

16. Defendants are hereby ordered and enjoined to immediately commence the phasing out of the existing trusty system at the penitentiary by taking the following steps:

(a) Eliminate all trusties at MSU and replace them with civilian guards;

(b) Replace all armed shooters in the fields with civilian guards.

The foregoing constitute the highest priority items in the elimination of the trusty system. Defendants shall exert every effort to obtain competent civilian personnel, making special appeal to the black community for qualified persons. Lack of funds shall not constitute valid grounds for continuing delay. In the event prison officials encounter difficulty in hiring the additional employees required by the terms of this paragraph because of restrictions on salary or residence as set by state law, they shall immediately apply to this court for authority to exceed such limitations on a temporary basis. The foregoing steps are to be accomplished not later than December 20, 1972. On that date, the defendants shall submit a statement of compliance with the provisions of this paragraph and also propose a plan for the total and complete elimination of the use of trusties for armed guard duty and for other custodial responsibility within six months thereafter, or not later than June 20, 1973. The plan shall include the type and nature of training program recommended for the new civilian guard force and proposals for recruiting personnel upon racially nondiscriminatory basis. In the interim period before total elimination of trusty custodial personnel, defendants shall insure, by a careful review of inmate personnel records and psychological tests, that inmates placed in a position of supervision or custody of other inmates are mentally and emotionally fit to perform their assigned tasks.

## PHYSICAL FACILITIES

17. As heretofore ordered, the defendants are hereby enjoined to make all improvements and expenditures which are specified in the Interim Committee's Report on Mississippi State Penitentiary (subject to recommendations of State pollution authority). These improvements, which include the installation of facilities, renovation of living quarters, employment of additional personnel, and purchase of other equipment and supplies, shall be completed on or before December 20, 1972.

18. It is further ordered that the defendants shall file by December 20, 1972, a report with the clerk of this court and simultaneously copies thereof with counsel for the plaintiffs and plaintiff-intervenor which details all facilities and equipment purchased, installed, and/or improved, the location of such installation or improvement, and the date of the installation or improvement.

## LONG-RANGE RELIEF

19. The defendants are further ordered and enjoined to prepare and submit to the court not later than December 20, 1972, a comprehensive plan for the elimination of all unconstitutional conditions in the inmate housing, inadequate inmate housing, inadequate water, sewer and utilities, inadequate firefighting equipment, inadequate hospital and other structures condemned by this court in its Findings of Fact and Conclusions of Law. The court notes with approval the appointment by the Administrator of LEAA of a three-man committee of disinterested penologists to offer technical advice and planning, and urges defendants to collaborate with them at an early date as well as to seek the participation and support of the leadership of the State Senate and House of Representatives. Without undertaking to dictate or limit the nature or content of long-range plans, the court suggests that areas of study should include at least the following:

(a) The feasibility of reducing the inmate population at Parchman by alternatives to incarceration, such as:

1. The housing of certain classes of inmates (e. g., first offenders, women prisoners, and inmates convicted of nonviolent crimes) at locations other than Parchman, including the possibility of arrangements with other state or federal penitentiaries, or instituting community-based facilities within Mississippi to house these prisoners.

2. Instituting a system of half-way houses to house inmates who have been convicted of minor offenses or certain types of first offenders.

3. Increased utilization of work-release, parole, and probation programs.

(b) Programs for maximum utilization of penitentiary assets, including:

1. Advisability of continuing the present farming operations, including the dairy, slaughter-house and cannery, and the number of inmates needed to continue all aspects of the farming operation.

2. Advisability of continuing to farm all of the acreage at Parchman and Lambert, including consideration of the possible alternatives of rental, sale, or other utilization existing acreage.

3. Advisability of expanding existing penitentiary industries to be coordinated with present and projected vocational training programs.

(c) Construction of new housing units which should include:

1. Plans for the type of housing units which will be constructed including the size, location and number of cells, dormitories or barracks and/or any other alternative. Requirements which will not only eliminate present overcrowding but allow for future expansion of prisoner population should be considered.

2. Plans for the location of any new housing units within the Parchman complex. These plans should detail the recommended distance between the units, the location and deployment of adequate security forces to prevent inmate escapes and assaults, access to vocational training, educational, and medical facilities, and the utilization of public roads and highways within the complex.

3. The estimated cost of alternative housing units, including the feasibility of utilizing inmate labor to construct these units and inmate production of the necessary construction materials.

(d) The construction of adequate facilities for the disposal of sewage which will comply with all federal and state requirements, providing an adequate supply of safe drinking water, and control of all rodents and insects.

(e) Plans for the delivery of adequate medical and health care which will include:

1. Advisability of constructing a complete medical center including a hospital within the Parchman complex considering the alternatives which include housing certain types of prisoners within other state institutions (e. g., mental hospitals, sanitariums, convalescent homes) or construction of wards in close proximity to such institutions or other available medical facilities.

2. Agreements with private hospitals or clinics to provide specialized and other services to inmates on a contract basis.

GENERAL PROVISIONS

20. In case defendants shall have any doubt or question as to the meaning, scope or application of any term of this order, the inquiry shall be submitted to the court in writing in a communication prepared by the State Attorney General or a member of his staff, and the responsive communication from the court or the court's personnel will be in writing. Copies of all such communications

shall be placed in the jacket file of this cause and concurrently served upon counsel for plaintiff and plaintiff-intervenor.

21. The defendants are charged with the duty of fully explaining the terms of this order to all their agents, servants, representatives and employees, including staff, guards and other personnel, to assure their understanding of the court's requirements and strict compliance therewith.

22. The court reserves the power to issue further and supplemental orders in aid of the provisions of this injunction or any of its terms, and also reserves for determination all issues not herein expressly dealt with, such as the question of reasonable attorneys' fees and costs allowable to the plaintiffs.

In lieu of service by the United States Marshal, the clerk of this court is hereby directed to send by United States mail a certified copy of this order to each of the named defendants, to-wit: Members of the Mississippi State Penitentiary Board, John Collier, Superintendent of Mississippi State Penitentiary, and William L. Waller, Governor of the State of Mississippi, and their counsel of record.