**Nazareth GATES et al., Plaintiffs,**

v.

**John COLLIER et al., Defendants.**

**No. GC 71-6-K.**

United States District Court,
N. D. Mississippi,
Greenville Division.

Jan. 31, 1975.

Roy S. Haber, Boulder, Colo., David Lipman, Jackson, Miss., Quinlan Shea, Dept. of Justice, Washington, D. C., for plaintiffs.

Roger Googe, Asst. Atty. Gen., James M. Ward, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On December 13, 1974, the private plaintiffs, who are penitentiary inmates, moved the court for further relief in accordance with its previous findings of fact and conclusions of law entered September 13, 1972, and judgment of October 20, 1972,[1] alleging that defendants had failed to comply with the order of the court in a number of material respects. Pursuant to the motion, the court scheduled and conducted, beginning January 29, 1975, pretrial conferences and a comprehensive evidentiary hearing designed to resolve factual issues in the following areas:

1. The constitutional adequacy of inmate disciplinary procedures.

2. The constitutionality of proposed prison mail regulations.

3. Racial discrimination allegedly practiced by prison officials in the housing and work assignments of inmates and the employment of a disproportionately low percentage of blacks in civilian positions.

1. Gates v. Collier, 349 F.Supp. 881 (N.D.Miss.1972), aff'd 501 F.2d 1291 (5 Cir. 1974).

4. Inadequate progress in the elimination of physical facilities heretofore found unfit for human habitation.

5. Inadequate progress in the elimination of overcrowding of the inmate population.

6. Inadequate medical services and facilities.

7. Inadequate protection of inmates from assaults by other inmates.

Although February 8, 1975, marks the fourth anniversary of the active pendency of this case before this court, and although we have, during that time, conducted numerous hearings directed at specific aspects of the penitentiary operation, this was the first truly comprehensive hearing covering virtually all the matters embraced in our October 20, 1972, order.

■■ In a pretrial conference with counsel for all parties being in agreement, the court resolved the issue relating to the adequacy of inmate disciplinary procedures by an amendatory order adopting the standards enunciated in Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L.Ed.2d 935 (1974) (see Appendix 2). In a second pretrial conference, the court next considered the comprehensive revised mail regulations submitted for approval by the penitentiary superintendent, received stipulations of counsel and took evidence on the limited issue of the prison officials' authority to open and inspect, but not read, in-coming inmate mail of a non-privi-

leged character, in the absence of the inmate.[2] The court, in a bench ruling, determined that such procedure was not violative of First Amendment rights, was necessary to the state's substantial interests of security, discipline, and good order, and was in conformity with Procunier v. Martinez, 416 U.S. 396, 94 S. Ct. 1800, 40 L.Ed.2d 224 (1974). We thereupon approved the revised mail regulations by an amendatory order. (Appendix 3).

Finally, at a three-day evidentiary hearing, the court received extensive oral and documentary evidence relating to the remaining issues. After due consideration, and in accordance with Rule 52, F.R.Civ.P., the court now makes findings of fact and conclusions of law.

## FINDINGS OF FACT

According to the overwhelming proof, commendable progress has been achieved by the defendants in many areas. As a result of new organizational legislation and increased appropriations for the penitentiary by the state's legislature, the undeviating support of the present governor for a professionally trained penitentiary administration, and the efforts of the present penitentiary staff, substantial progress has been made toward removing or eliminating, if not in whole then certainly in great part, many of the nefarious practices and conditions which this court found to exist in 1972. Unquestionably, much progress at Parchman has occurred, and it is grati-

2. By our prior order, incoming inmate mail of a non-privileged character could be opened only in the presence of the inmate addressee. 349 F.Supp. at 898–99. The prison's experience with this mandate was that, in order for incoming mail to be opened in the inmate's presence, the mail had to be transported, unopened, to each of the 20 widely-scattered residential units. Once there, the mail was subjected to varying and often cursory inspections by the individual camp sergeants.

Under the procedure, uniformly bad results were obtained. Merchandise which had been fraudulently ordered on credit by inmates was often not intercepted; "tax refund"

checks honoring bogus claims, cash in large amounts, drugs, and other contraband materials flowed through the mails uninterrupted. ·Other laxities in mail inspection cropped up, to plague the institution and the public at large.

We thus concluded that, in a prison setting such as Parchman, mail inspection at a central point, by trained officers applying uniform standards, was an institutional necessity. Clearly, since inmate presence each day at a central location would be a physical and disciplinary impossibility, this inspection would have to be carried out in the absence of the inmate addressee.

fying to this court to be able to so declare.

First and foremost among the improved conditions, the responsibility for the institution's security has been shifted from the inmates themselves to the civilian staff. This was accomplished largely by the transfer to correctional officers of all custodial authority, which had for decades been vested in the Parchman inmates, not only as armed trusties but in various other positions of authority over fellow inmates. A necessary concomitant of this transfer was, quite naturally, the employment and training of competent free-world personnel to intelligently operate a penal institution in accordance with generally accepted correctional standards. We are satisfied that this has been achieved. According to undisputed evidence, the civilian staff is now subjected to an intensive initial training program with ongoing training required. Applicants for employment are considered on the basis of merit and qualifications; political considerations are apparently eschewed. Merit promotions, calculated to retain a better grade staff, are awarded to employees having records of satisfactory work performance. The history of the Mississippi corrections system, both before and after our comprehensive *Gates* order, provides vivid proof of the importance of professionally trained staff in a prison setting. Experience has taught well that, without intelligent direction from the top echelon down to the civilian employees of least rank, the state's purposes in incarcerating those convicted of crime are inevitably thwarted and frustrated; rehabilitation is illusory, and the conditions of daily penitentiary life become barbaric. As one penologist testified, a prison can be "a good place to learn to hate," and where physical survival becomes the only consideration, the completion of sentence may return the inmate to society with irreparable damage.

The evidence shows improvement in other general areas of the prison's operation, such as food service, fire protection, inmate clothing and supplies, vocational and general education, and the reduction of escapes and public security. Other essential services now available to inmates include an adequate recreation program, expanded counseling services, a family visiting program, full chaplaincy service, the exercise of religious freedom under reasonable rules and regulations, and the installation of a full law library. Meaningful inmate classification, long nonexistent, has been established, although still in a primitive state. Despite marked improvement in both the quality and quantity of medical and health services and in inmate protection, these vital matters will be the subject of later critical comment.

Various kinds of physical improvements have been made to the penitentiary property, most notably the construction of three "temporary" residential units, each housing 100 men, the completion of the first phase of a new women's unit, a reconstructed drug rehabilitation center, and other special purpose buildings. A fourth temporary unit to house 120 inmates will soon be built with construction funds now available. Other improvements include a new sewage system, a new water system with a deep well under construction, cold storage facilities, a drug abuse center, and a security building. Also under contract is a new medium security unit designed to house 192 inmates in single-cell accommodations. This structure, costing $2,000,000, is jointly funded by state and federal sources.

The evidence indicates almost without dispute that racial discrimination at the penitentiary has for all practical purposes been eliminated. Equality of treatment of minority inmates, in work assignments, housing, discipline, education, and in other ways, now obtains at the prison. Likewise, employment of blacks at different levels of the penitentiary staff, in both the security and nonsecurity divisions, is indicative of an absence of racial discrimination. Blacks not only serve as correctional officers but as camp sergeants and in oth-

er positions of responsibility. The number of blacks employed at the penitentiary, in relation to the total staff of 560 persons, is further evidence of equal and nondiscriminatory employment practices. For example, 45% of the security force is black, while 8% of the nonsecurity personnel are members of minority races, with the vast majority of inmate counselors being black. The penitentiary conducts an active recruitment program to encourage members of all races to apply for vacancies. The elimination of racial discrimination, among both inmates and employees, in this short time has been made possible only by the techniques and procedures introduced by a professionally motivated and dedicated staff.

Despite continuing progress at Parchman in certain areas, serious problems remain in others, often with constitutional significance. First, although a master plan for corrections in Mississippi, commendably devised by Mississippi officials, has been submitted to and approved by the Law Enforcement Assistance Administration (LEAA), the master plan contemplates the dispersal of the inmate population to several points within the state. More importantly, under existing federal regulations, no additional federal funds of a substantial nature may be awarded to Mississippi for the construction of housing units or other facilities at the Parchman site. The reason for this restriction on additional substantial federal money is LEAA's position that the concentration of prison inmates at a single location or operating facility, in numbers exceeding 400, is contrary to generally accepted modern prison practices. Unfortunately, Parchman, which is the only correctional facility in Mississippi for adult felons, now contains approximately 2100 inmates, and the prison population is steadily expanding—at a current incre-

mental rate of 30 inmates per month.[3] The state legislature, aware of the problem, has not yet adopted any legislative plan to disperse adult felony offenders at points away from the Parchman penitentiary, and if Parchman remains the sole site for incarceration of felony offenders, Mississippi can expect to shoulder the entire burden without financial asssistance from "Big Brother".

This present and perhaps permanent unavailability of federal assistance compounds an already critical housing situation. We know from the undisputed evidence that generally accepted correctional standards require a minimum of 50 square feet of living area for every prison inmate. Penologists offered by the private inmates and the government as well as the corrections specialists on the Parchman staff agree that this requirement is needed to ensure a minimum level of decency. The evidence indicates, however, that no study has yet been made of the amount of space available to Parchman inmates under existing housing conditions, although the clear inference is that, at least in many housing units as a result of inmate overcrowding, the minimum space standard is not met. As of this date, the only future planning which exists for additional permanent inmate housing (beyond that already mentioned) is a 192-man close security unit for which no state money has been appropriated and for which federal funds, under present regulations, can never be available.

The evidence also shows that many of the inmate residential camps, now quite old structures, continue to remain in a state of deplorable and appalling disrepair. Many are beyond repair and, notwithstanding efforts to improve their superficial appearance, they remain unfit for human habitation. Many inmates thus continue to be housed under the subhuman conditions noted by this

---

3. Factors affecting increase of the inmate population include the reduced number of parolees granted parole in recent months by the state parole board, a limited number of inmates released on the relatively new work release program, which is subject to restrictions from local county officials, (see Miss. Code Ann. § 47–5–165), and a statutorily controlled "good time" credit policy (see § 47–5–139).

court in September 1972. There are two consequences which spring directly from the continued use of these old, condemned structures. First, since the housing units are constructed in open, dormitory style, overcrowding of inmates may easily and often does occur. Next, the openness of the living arrangement itself affords inmates minimum protection from assaults by other inmates. Although the present prison staff, through shake-down procedures to discover weapons and stationing correctional officers within housing units at all times and especially during the night hours, has to some extent reduced hazards of inmate assault, the fact remains that inmates are compelled to live in such close quarters that prevention of acts of violence is virtually impossible.

*According to* Dr. Robert Brutsche, Assistant Surgeon General of the United States Public Health Service and the chief medical advisor to the United States Bureau of Prisons, the medical facilities and services at Parchman have shown marked progress within the past two years. This expert stated that all of the court's requirements regarding this vital service to prison inmates has been substantially complied with, and worthwhile innovations established, except for two remaining gross deficiencies. First, Parchman has only one full-time physician, upon whom and whose staff is thrown the burden of medical care for not only the inmates but the penitentiary staff and their families.[4] At one time Parchman had three physicians but was unable to retain them. A most critical need exists for two additional full-time physicians, one a chief medical officer and the other a psychiatrist; this fact is acknowledged by all concerned. In fact, bills pending in the current legislative session seek to raise salary levels to fill these professional categories. Next, the existing

hospital building, although in the charge of a competent administrator, is grossly inadequate for the prison needs, is incapable of repair, and should be replaced by a new facility. Other aspects of the health program, such as supporting staff, dental care, drug supplies, pharmaceutical and radiology services and medical equipment are found to be adequate. Good rapport exists between medical and security personnel, thus allowing proper access of inmates to medical care. Better use of the existing hospital, however, could be made by removing living quarters of working inmates, thus making needed bed space available for ill patients, including the mentally ill now housed elsewhere.

The maximum security unit at the present time is used to confine two men in units designed for single cell occupancy. Although this practice is undesirable, the number of inmates at Parchman posing substantial security risks exceeds the number that can be properly housed at the maximum security unit, and there is no other prison facility suitable to confine prisoners of this class. Moreover, the current practice of indiscriminate mixing in the maximum security cells of those there permanently and those confined there temporarily as punishment for infraction of prison rules is not conducive to good correctional results. The prison staff and the classifications committee are acutely aware of the problems presented by the presently limited capacity for confining inmates who are maximum security risks.

The state of cleanliness and sanitation at the residential camps varies widely. In many of the residential camps filth and uncleanliness, to an intolerable degree, have been allowed to prevail. Also, there is excessive idleness on the part of many inmates, even at camps where filthy conditions obtain. Penologists agree that undue idleness by

---

4. The medical staff presently numbers 18, with 4 nurses, 7 physician's assistants, and medical records personnel, as well as 2 dentists. Further, the penitentiary contracts with nearby towns for other medical serv-ices, and in more serious cases utilizes the facilities of the University of Mississippi Medical Center in Jackson, 120 miles away. In emergencies, nearby civilian hospitals are resorted to.

prison inmates is an unwholesome condition and is likely to retard the process of rehabilitation. Testimony from the prison staff reflected their understanding that Parchman inmates could not lawfully be required to work. This was a misconception of this court's prior order.[5] As counsel for both the United States and the inmates agreed, useful work for inmates is not only wholesome but desired. Any interpretation of our prior order that inmates are barred from being required to work is erroneous. On the contrary, a work program for all able-bodied inmates would be beneficial both to the inmates and to the institution.

## CONCLUSIONS OF LAW

██ The Mississippi State Penitentiary is presently being operated in a manner which, except as hereinafter stated, complies with the Constitution of the United States. Fully cognizant that the penitentiary is a Mississippi institution and as such should be managed and operated by the state's agents in accordance with state law, rules and regulations, federal courts should accordingly be reluctant to intervene in the orderly functioning of state institutions. Thus, our concern is limited solely to determining whether the state has been able to achieve constitutional compliance, and we continue to disavow any purpose to render the penitentiary subject to federal superintendence and control.

██ So long as constitutional violations are not involved, questions of penitentiary administration, methods and management, and whether certain procedures are wise are determined by the state and its prison administrators, without interference from this federal court. Hence, critical comments we make regarding lack of sanitation and state of uncleanliness in some of the housing units, residual deficiency in classification procedures, present methods of operating the maximum security unit, placement of inmates who represent maximum security risks, the best use of available hospital space, and other multitudinous procedures relating to the daily administration of the penitentiary concern problems for the defendants to resolve in the exercise of sound discretion. It would be improper for this court to substitute its judgment for the expertise of correctional officers in coping with special needs or individualized problems presented by certain classes of offenders. We, therefore, reject the appeals made by counsel for prison inmates and the Department of Justice for this court to enjoin the defendants from placing more than one man in a maximum security cell, or to take specific steps to eliminate conditions of filth and lack of sanitation at many residential camps, or to inaugurate work programs for able-bodied inmates, or to make better use of hospital bed space for in-patient service. Moreover, we are confident that these conditions, now that they have been bared at this hearing, will be administratively handled with optimum results without delay.

██ On the basis of the foregoing findings of fact, however, that portion of the court's October 20, 1972, judgment headed "Medical Facilities" has not been adequately met by defendants. In this material respect, the state's continuing failure to provide for the physical health and well being of inmates contravenes the Eighth Amendment as well as state law. Gates v. Collier, 349 F.Supp. at 894. To assure an acceptable level of medical services for the inmate population, defendants must exert maximum efforts to employ two additional doctors, one a chief medical officer and the other a psychiatrist. Similarly, a new hospital facility or structure to house inmates suffering se-

5. As brought out in oral argument by government counsel, defendants, in case of any doubt or question as to the scope or application of the order, were expressly provided an opportunity to submit to the court for clarification a written inquiry by the state's Attorney General or a member of his staff. 349 F.Supp. at 904. The state's failure to seek clarification in this instance is as regrettable as it is inexcusable.

rious illness or disease and requiring in-patient care *must* be provided. Accordingly, the court will issue an order requiring the defendants to establish a time table for and to implement more adequate medical services and facilities as herein set forth.

Again, on the basis of undisputed proof, many if not most of the aged housing units continue to remain in appalling, deplorable condition and are unfit for human habitation. The Constitution mandates that the present inmate population not continue to be confined in such quarters; and Mississippi has no exemption or shield whatever from complying with constitutional imperatives. The court is impressed with the size and nature of the very considerable problem confronting the defendants from having to use condemned facilities to house inmates, with consequent overcrowding circumstances. Nevertheless, the prison's constitutional deficiency must be attacked, plans made now and feasible solutions provided without delay.

We recognize that removal of the residual constitutional evils at Parchman will require not only intelligent planning but time for major construction, even if funding was presently available. A further complication arises from the absence of funding to begin a program of building new housing units. Indeed, even at this late date, the Mississippi legislature has yet to decide whether to disperse adult offenders to other locations and thus qualify for substantial LEAA financial aid, or to forego federal aid and expand permanent improvements at the Parchman site, solely with state funds. The choice, of course, belongs to Mississippi, but the necessity for some solution to comply with constitutional principles presents a crisis which must be forthrightly addressed, and addressed now, by the state legislature if Mississippi is to be allowed to continue using Parchman as a place for incarcerating large numbers of convicted felons.

This court has reason to believe that there exists in this state a general public interest among citizens in needed penal reform and a disposition by the Mississippi legislature to move forward toward the goal of having a constitutionally run penitentiary. Even so, it is our clear duty to forthwith direct the defendants, the state's governor, the superintendent of Mississippi State Penitentiary, and the members of the state penitentiary board, to submit pertinent data regarding the inmate population and specific plans for the establishment of time tables to identify and eliminate those residential camps unfit for human habitation. We must further direct the defendants to present to the court alternative means for reducing the prison population to levels not inconsistent with constitutional standards, whether or not the necessary reduction may be accomplished within the frame work of existing state law.

Finally, we indulge the hope that our fellow trial judges on the state bench, whose sentencing responsibilities for state convictions are the same as ours for federal convictions, will gain first-hand knowledge of the Parchman crisis, should it not be realized already, and in conjunction with state prosecutors, institute cooperative, yet coordinated, efforts to aid the prison administration in reaching correct solutions.

A comprehensive order directing the defendants to establish a time table for and proceed to implement adequate medical facilities and services and reduce overcrowding of prison inmates at residential camps as well as eliminate those residential camps unfit for human habitation will be issued forthwith. (Appendix 1). This order is the next step we find it necessary to take, and it is but preliminary to further implementing mandates. We conceive it our duty to fashion decrees consonant with principles of equity and justice to bring Parchman and the inmates for which it is responsible under the umbrella of the Constitution of the United States.

## ORDER

This cause having been submitted on the motion for further relief of the pri-

vate plaintiffs, partially joined in, ore tenus, by the United States as plaintiff-intervenor, and all parties having appeared in court personally and by their attorneys and announced their readiness for trial, and after the submission of oral and documentary evidence and statements of counsel and the court having informally delivered from the bench findings of fact and conclusions of law as contained in the court reporter's notes on file herein, the motion for further relief is sustained to the extent set forth in the next paragraph hereof.

The court finds that there is a constitutional requirement for the defendants to establish a time-table for and proceed to implement (a) adequate medical facilities and services, and (b) the reduction of overcrowding of prison inmates at residential camps as well as the elimination of those residential camps unfit for human habitation. It is, therefore,

Ordered

That William L. Waller, Governor, Jack K. Reed, Superintendent of Mississippi State Penitentiary, Charles Riddell, Chairman, Andrew C. Baker, Cleve McDowell, H. M. Raney and Tyler Fletcher, members of the Mississippi State Penitentiary Board, be and they are hereby commanded to do as follows:

(a) Within 90 days from this date submit a plan for the design and construction of a new prison hospital, disclosing the floor plan, size and character of a structure adequate to serve the medical needs of prison population, with estimates for construction cost and funding sources, and with projected dates for beginning and completion of the new hospital facility. In addition thereto, defendants shall, within said period of time, exert maximum efforts to employ two additional doctors, including a chief medical officer and a psychiatrist, and advise the court with respect to such efforts.

(b) Within 60 days from this date submit to the court a comprehensive plan for the reduction of the prison inmate population and the elimination of residential camps unfit for human habitation, including but not limited to the following data:

1. An analysis showing the location of the present inmate population according to residential camps and other housing units as of a current date.

2. An analysis of the maximum number of prison inmates that can be housed in accordance with the generally recognized correction criteria of not less than 50 square feet per inmate, by use of the presently existing facilities and any that can be rendered useable within the next 6 months. A list of the inmate population envisioned for each camp or other housing facility must be set forth.

3. A study of each residential inmate camp or housing unit which is unfit for human habitation and upon which it would not be feasible to make substantial or major repair. All camps and housing units presently employed should be listed in order of their unfitness or undesirability for continued use for inmate habitation, with a detailed description of the factual basis for such determination. This information is needed for the court to address the issue of the priority in which residential camps or other structures unfit for human habitation must be eliminated.

4. Plans which the defendants would recommend to the court as alternative means for reducing the prison population at the Mississippi State Penitentiary to a level not inconsistent with constitutional standards. This plan should prefer those alternatives which may be accomplished within the framework of existing state law; to the extent that such alternatives cannot realistically be expected to work, and to work now, state the order of priority of other alternatives which are consistent with good correctional practices and which may require the modification of existing state law. In addition, the plan should specify to what extent the prison administration has meaningful interaction with the Mississippi State Probation and Parole Board or other state agency having

jurisdiction over persons convicted of crime and to what extent these agencies could assist in reducing the prison inmate population. The plan should also delineate what feasible programs, if any, may be devised for consideration by the district attorneys, prosecutors and sentencing judges of Mississippi regarding sentencing alternatives for certain classes of offenders for whom incarceration at Parchman may be considered relatively less desirable. The court solicits further proposals which private plaintiffs, plaintiff-intervenor, or the defendants may wish to make either individually or collectively as practicable means of eradicating remaining unconstitutional conditions at Mississippi State Penitentiary which exist as a result of overcrowding, dwellings unfit for habitation, or both.

The clerk of this court is hereby directed to effect service upon all of the defendants hereinabove named by placing in the United States mail a certified copy of this order and noting the fact of such mailings on his docket.

This, 3rd day of February, 1975.

(s) William C. Keady
Chief Judge
United States District Court

## APPENDIX 2

## ORDER AMENDING DISCIPLINARY PROCEDURES FOR INMATES AT MISSISSIPPI STATE PENITENTIARY

Upon consideration of the jacket file, and applying the standards enunciated in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 935, 41 L.Ed.2d 935, 955–60 (1974), and Gates v. Collier, 501 F.2d 1291, 1317–19 (5 Cir. 1974), that portion of this court's prior order dated October 20, 1972, headed "Discipline of Inmates" is hereby amended to read as follows:

"The Penitentiary officials and all persons in privity with them are enjoined from imposing any form of disciplinary punishment which results in solitary or disciplinary confinement, loss of good time, or in any other major adverse change in the condition of an inmate's confinement except under the following due process requirements:

(a) An inmate may not be punished except for conduct which violates an existing penitentiary rule or regulation.

(b) An inmate accused of infraction of an existing penitentiary rule or regulation shall be given written notice of the charge against him, which notice shall identify the prison rule alleged to have been violated and state essential facts supporting the alleged violation. The notice shall be served upon the accused at least 24 hours prior to the hearing.

(c) The accused must be afforded an opportunity to appear before a tribunal to respond to the charge. In no event shall any person who brought or assisted in bringing the charge, or who participated in any way in the investigation of the facts on which the charge is based, or who has any personal interest in the outcome of the disciplinary proceeding serve on the disciplinary tribunal which conducts the hearing.

(d) The inmate facing disciplinary proceedings shall be allowed to call witnesses and present documentary evidence relevant to his defense unless the prison superintendent certifies in writing and with particularity that permitting such inmate to do so will be unduly hazardous to prison safety or security.

(e) Where the accused is functionally illiterate or where the complexity of the issue makes it unlikely that the inmate will be able adequately to collect and present the evidence in his case, the accused shall, in preparation of his defense to the disciplinary charges, be free to seek the assistance of a fellow inmate, or else be furnished adequate substitute assistance in the form of help from the penitentiary staff or from a sufficiently competent inmate designated by the staff.

(f) As soon as practicable after the conclusion of the hearing, the disciplinary tribunal shall make a written statement of fact setting forth the evidence relied upon and the reasons for the disciplinary action taken. A copy of this written statement shall be made available to the inmate. In the event that revelation of certain evidence upon which the disciplinary tribunal relies will endanger prison security or the safety of inmates or other personnel, such evidence may, with the express approval of the superintendent, be omitted from the written statement. In any case where such omission is deemed necessary by the disciplinary tribunal, the written statement shall contain the fact of the omission and the basis therefor."

This modification of the court's prior order of October 20, 1972, shall remain in effect until otherwise ordered; provided, however, that within 30 days from this date defendants shall submit more detailed procedures relating to inmate discipline, not inconsistent with this order, for the purpose of amplifying and implementing the requirements herein imposed.

In other respects, except as hereinabove modified dealing with the discipline of inmates, ¶ 7, this court's prior order shall remain in full force and effect.

The Clerk of this court shall serve a certified copy of this order, by mail, upon Jack K. Reed, Superintendent, Mississippi State Penitentiary, Charles Riddell, Chairman, Mississippi State Penitentiary Board, and A. F. Summer, Attorney General of the State of Mississippi.

This, 30th day of January, 1975.

(s) William C. Keady
Chief Judge
United States District Court

## APPENDIX 3

### REVISED MAIL REGULATIONS

The Mail Regulations contained in Article 4 of the Mississippi State Penitentiary Rules and Regulations are hereby superseded by the following procedures. These procedures shall remain in effect pending full revision and publication of the new Mississippi State Penitentiary Rules and Regulations Handbook.

1. POLICY REGARDING MAIL. It is considered essential to the eventual resocialization of the inmates that they maintain contact with their families and desirable friends through use of the mail. Therefore, inmates are encouraged to make use of the mail, and every means compatible with security is provided for them to do so.

2. DEFINITIONS. For the intent of this directive, the following definitions apply wherever the word censor, censorship, or inspection of the mail appears.

a. MAIL CENSORSHIP. To open, read, and examine the mail in order to discover, forbid, deny or eliminate objectionable or perceptible expressions that advocate, suggest, or plan treacherous or criminal activities.

b. MAIL INSPECTION. To open, and inspect, but not read, mail to detect money, drugs, liquor, weapons, and other tangible material expressly prohibited by state and federal laws or in violation of penitentiary rules.

3. PRIVILEGED MAIL. Mail addressed to or received from any of the following will be considered privileged mail and will not be opened, delayed or otherwise interfered with except as specifically set forth hereafter in this paragraph.

a. Officials of the federal, state and local courts;

b. All federal officials, including the President of the United States, any Senator, or Congressman, and officials of any United States Department or Agency, with the exception of the Internal Revenue Service; and all state officials including the Governor, members of the State Senate and House of Representatives, and offi-

cials of any state department or agency;

c. All members and employees of the State Probation and Parole Board; and

d. The inmate's attorney(s). For the purpose of these regulations, this includes any attorney representing the inmate in any pending or contemplated action—civil or criminal—in any duly constituted local, state or federal court, or any attorney that the inmate is attempting to retain for such purpose. It also includes any attorney whom the inmate has retained or contacted, or is attempting to retain or contact, for legal advice concerning any other civil or criminal matter. The term attorney also includes any legal services organization providing legal assistance through employee-attorneys.

In order to assist in identifying outgoing privileged mail, inmates are requested to mark mail addressed to any person, department or agency included in categories "a", "b", or "c" with the words PRIVILEGED MAIL; inmates shall mark any mail including in category "d" with the words LEGAL CORRESPONDENCE, but this marking shall not be placed on any letter not addressed to any attorney. Mail marked LEGAL CORRESPONDENCE will be checked against a current attorney register that lists all attorneys practicing in the United States and in particular the State of Mississippi. If the name of the addressee attorney is not listed in such a register, the letter will not be dispatched until it is determined whether the addressee is or is not an attorney. This verification process will be initiated and completed within 24 hours, barring unusual circumstances. Mail so marked, but determined not to be entitled to LEGAL CORRESPONDENCE status, shall be deemed to present reasonable grounds for suspecting that the communication is an attempt to formulate, devise, or otherwise effectuate a plan to escape from the penitentiary, or to violate penitentiary regulations or the laws of the State of Mississippi or the United States, and such a letter may be opened, inspected and read in the presence of the sender by a representative of the Superintendent designated for this purpose.

Incoming privileged mail will be delivered to the inmate addressee unopened, except as indicated below. Where it appears from external manipulation, fluoroscopy, etc., that there are enclosures contained in the letter, it may be opened in the presence of the inmate and the nature of the enclosures ascertained. Whenever penitentiary officials have reasonable grounds to suspect the authenticity of any incoming letter which purports on its face to be within the privileged mail category, such letter may be delayed pending verification, which shall be initiated and completed as quickly as possible. Mail determined not to be from the official, department, agency or attorney shown in the return address may be opened, inspected and read in the presence of the inmate. Whenever penitentiary officials have reasonable grounds to suspect that the incoming letter is part of an attempt to formulate, devise, or otherwise effectuate a plan to escape from the penitentiary, or to violate penitentiary regulations or the laws of the State of Mississippi or of the United States, such mail may be opened and inspected, and, if necessary, read in the presence of the inmate addressee; provided, however, that a record shall be made and retained showing the basis for suspecting the existence of the aforementioned activities. Whenever incoming mail which purports on its face to be privileged mail is opened and inspected, or opened, inspected and read pursuant to this paragraph, it shall be done only by a representative of the Superintendent designated for this purpose, and a record shall be made of such opening, etc., which shall include the reasons therefor.

4. NONPRIVILEGED OUTGOING MAIL. All such outgoing mail to any addressee, except to another inmate of this penitentiary, will not be interfered with except to open, inspect, and read in

the presence of the inmate where penitentiary officials have reasonable grounds to suspect that the letter is an attempt to formulate, devise, or otherwise effectuate a plan to escape from the penitentiary, or to violate penitentiary regulations or the laws of the State of Mississippi or of the United States. A record shall be made and retained showing the basis for suspecting the existence of the aforementioned activities. Inmate mail addressed to another inmate of this penitentiary will be subject to inspection and censoring at the central mail office, by a designated representative of the Superintendent.

Outgoing commercial mail will be stamped MISSISSIPPI STATE PENITENTIARY prior to dispatch.

Outgoing mail will be picked up daily from all camps by a designated security officer and delivered to the central mail office for processing and dispatch. Prior to pickup, each piece of outgoing mail will be screened by a camp security duty officer to insure that the transmitting envelope bears the proper, required return address that identifies the sender by name, MSP number, camp designation and Parchman, Mississippi 38738, as follows:

> Mr. Joe Doe, #377702
> Camp 8
> Parchman, Mississippi 38738

Mail with improper return addresses will not be picked up or dispatched, but will be returned to the sender. Inmates must use their true name as it appears on their commitment order and their current MSP number in their return address.

5. NONPRIVILEGED INCOMING MAIL. All such incoming mail will be opened and inspected at the penitentiary central mail office by a designated representative of the Superintendent for money, drugs, weapons, liquor or other materials expressly prohibited by state or federal law, or in violation of penitentiary regulations. Such mail will be processed as follows:

a. *Letters.* Letters will be slit open along the top seam of the enevelope and inspected for contents. Upon completion of inspection, the letter will be resealed in its envelope by a staple and the enveloped stamped "MISSISSIPPI STATE PENITENTIARY" followed by the inspector's initial.

b. *Letters Containing Funds.* Letters containing funds will be processed in the same manner as above. The funds will be removed from the letter by the inspecting officer and transferred to the central accounting office where they will be deposited and credited to the inmate's account. A receipt for same will be placed in the letter for delivery to the inmate concerned.

c. *Packages.* Packages will ordinarily be delivered unopened to each camp where they will be opened in the presence of the inmate by the Camp Sergeant and inspected for contents and contraband. Such packages may, however, be opened at the penitentiary central mail office for inspection by a duly authorized representative of the penitentiary. Packages containing unusual items or items in excessive quantities will be impounded pending investigation. The inmate concerned will be given a receipt for the impounded property, and the package will be held in safekeeping pending investigation results. Funds found in packages will be removed by the inspecting officer and transferred to the central accounting office for deposit in the inmate's account.

d. *Registered and Insured Mail.* Registered and insured mail will be processed in the same manner as indicated above. Postal receipts for same will be accepted at the camp by the inmate concerned or by a member of the camp security staff. Completed postal receipts will be returned to the Parchman Postal Branch Office for filing and postal retention.

e. *C.O.D. Mail.* No. C.O.D. mail of any kind will be accepted for an inmate.

f. *Private Mail Service.* Mail or packages received for an inmate via pri-

vate services such as United Parcel Post Service will be processed in the same manner as mail received through the United States Postal Service.

g. *Letters Provoking Emotional Problems.* Letters containing material which would cause severe psychiatric or emotional disturbance may be disapproved for receipt. Disapproval of a letter on this basis may be done only by a member of the institution's psychiatric staff or psychiatric consultant after conference with the inmate's counselor. The staff member may disapprove the letter only upon finding that receipt of the information contained would be likely to adversely affect the penitentiary discipline or security, or the inmate's rehabilitation and that there is no reasonable alternative means of ameliorating the possible problem facing the inmate. When a letter of this nature is disapproved for receipt the Deputy Superintendent for Care and Custody will be made cognizant of the disapproval within 24 hours. He will review this action on a timely basis to ensure the disapproval action can be removed at the earliest possible time. When an inmate is prohibited from receiving the letter, the letter and a written and signed notice stating the reason for disapproval will be given to the sender from the Deputy Superintendent for Care and Custody.

h. *Delivery and Dispatch.* Incoming mail will be inspected, processed, and delivered to the camps and addressees on a timely basis consistent with its arrival at the penitentiary. Outgoing mail will be dispatched daily Monday through Saturday. There will be no undue delays.

6. MAIL LIMITATIONS. There shall be no restrictions placed on the number of letters or addressees to whom an inmate may write except those restrictions imposed by the Associate Superintendent of Custody. Before any such restrictions are placed, the Associate Superintendent of Custody will notify the inmate in writing explaining the reason for the proposed restrictions, and giving him a reasonable opportunity to be heard. If such restrictions are imposed, a record shall be made and retained stating the basis of the action. Any such restriction shall, upon the inmate's request, be subject to review by the Superintendent.

7. NEWSPAPERS AND PERIODICALS. Inmates may subscribe to newspapers and periodicals provided they come directly from the publishers and are not overtly pornographic or in violation of state or federal laws. Publications such as "Playboy" and "Oui" are not considered pornographic. Questionable material will be submitted to the postal authorities for clarification.

8. LETTER WRITING. Letters may not be written after retirement, in any place, or at any time that will interfere with the inmate's work assignment or other duties.

9. MAIL ORDERS. Inmates may not order any books, records, tapes, or any other article of merchandise whatever on a "Charge" or "Pay Later" or "Free Trial" basis. Inmates may order such articles, to include art and craft materials, only when payment in full accompanies the order. Draw requests for these purchases will be made to the central accounting office and a check drawn against the requesting inmate's account will be effected and included with the order. Inmate mail addressed to known mail order houses or concerns will be subject to inspection to insure this regulation is being complied with.

10. RECEIPT OF FUNDS. Funds may be received only through the mail by money order, certified check, or personal check. With the exception of Federal or State issued checks, money orders and checks must be made payable to the Mississippi State Penitentiary for the inmate payee (Inmate name and MSP number). Checks and money orders should indicate the true name of the inmate as it appears on the commitment order, and the most current assigned MSP number. Cash received in the mail and improperly made checks

and money orders will be returned to the sender. To expedite funding, it is recommended that funds be mailed directly to the Mississippi State Penitentiary, Bookkeeping Department, Post Office Box 500, Parchman, Mississippi 38738. All funds arriving through the mail *must* be deposited into the inmate's account and under no circumstances given directly to the inmate. Inmates receiving unusually frequent or large sums of money, with the exception of pension checks, will be subject to mail censorship until the funding source has been ascertained.

11. CONTRABAND. Contraband found in the mail will be confiscated and appropriate action taken in respect to the removed material. The inmate concerned will be notified in writing of any contraband removed from his mail and the reason therefor. Contraband shall be defined as those items or materials listed in paragraph 5 above.

12. MISUSES OF MAIL. When an inmate receives mail containing contraband, or openly becomes involved in schemes fraudulently using the mail for personal gain, such as fraudulent mail order purchases, or when reasonable belief exists through tangible evidence that his or her correspondence will fall into any one of the following categories, that inmate's mail will be subject to reading and censoring in accordance with the following criteria. (Reference: Supreme Court decision April 29, 1974). If censoring is imposed, a record shall be made and retained showing the basis for censorship. The imposition shall be reviewed at least every 30 days by the Associate Superintendent of Custody to evaluate the necessity for continuing the censorship requirement.

a. *Outgoing Letters*. Outgoing letters may be disapproved for mail only if the outgoing letter falls as a whole or in part into any of the following categories:

(1) The letter contains threats of physical harm against any person or threats of criminal activity.

(2) The letter threatens blackmail or extortion.

(3) The letter concerns sending contraband in or out of the institution.

(4) The letter concerns plans to escape.

(5) The letter concerns plans for activities in violation of institutional rules.

(6) The letter concerns plans for criminal activity.

(7) The letter is in code or the contents cannot be understood by the reader.

(8) The letter solicits gifts of goods or money from other than family.

(9) The letter is obscene.

(10) The letter contains information which if communicated would create a clear and present danger of violence and physical harm to a human being.

b. *Incoming Letters*. Incoming letters to inmates may be disapproved for receipt only for the foregoing reasons.

c. Outgoing or incoming letters may not be rejected solely upon the grounds that they contain criticism of the institution or its staff members.

d. *Notice of Disapproval of Inmate Mail*.

(1) When an inmate is prohibited from sending a letter, the letter and a written and signed notice stating the authorized reason(s) for disapproval and indicating the portion or portions of the letter causing disapproval will forthwith be given the inmate; and the inmate shall within 72 hours after receipt of such notice be given an opportunity to respond to the reason(s) assigned for the prohibition.

(2) When an inmate is prohibited from receiving a letter, the letter

and a written and signed notice stating the authorized reason(s) for disapproval and indicating the portion or portions of the letter causing disapproval will be given the sender. The inmate will be given notice in writing that a letter has been rejected, indicating the authorized reason(s) and the sender's name. The inmate shall within 72 hours after receipt of such notice be given an opportunity to respond to the reason(s) assigned for the prohibition.

(3) Material from outgoing correspondence which violates the provisions of paragraph 9 and/or 12a may be placed in an inmate's file and be the basis for appropriate disciplinary action. Other material from incoming and outgoing correspondence may not be placed in an inmate's file until it has been properly reviewed by the cognizant department head having jurisdiction over the area concerned and it is determined that the material could affect the penitentiary discipline, security, or the inmate's rehabilitation or suggests participation in criminal activity. Entries will be annotated by the department head detailing the reason for the entry bearing in mind the inmate has no physical control over the contents of mail sent to him. Accordingly, the receipt of objectionable material will not be entered into the inmate's file in such a manner that it unjustly affects the inmate's record in an adverse manner. The inmate will be notified in writing of the placing of any material from correspondence in his or her file.

13. Administrative review of inmate grievances regarding the application of rules contained in this procedure may be had in accordance with current grievance policies.

14. It is mandatory that all information learned or realized through the inspecting or censoring of inmate mail be kept on a confidential official basis and only be divulged to those with a definite need to know. Under no circumstances will information learned or realized be used as a medium of idle gossip, slander, or defamation of the inmate or his correspondent.