**James F. HEIMERLE, Plaintiff,**

v.

**ATTORNEY GENERAL, United States of America, Director, United States Bureau of Prisons, Warden, Federal Correctional Institution, Otisville, New York, John Doe, Jane Doe, Correctional Officers, Federal Correctional Institution, Otisville, New York, John Doe, Jane Doe, Supervisory Staff, Federal Correctional Institution, Otisville, New York, Defendants.**

**No. 82 Civ. 5900 (LBS).**

United States District Court,
S.D. New York.

Dec. 13, 1983.

See also, D.C., 558 F.Supp. 1292.

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff; James F. Sweeney, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendants; Stephen A. Dvorkin, Asst. U.S. Atty., New York City, of counsel.

## OPINION

SAND, District Judge.

The plaintiff, James F. Heimerle, has brought this action pursuant to 42 U.S.C. § 1983 to challenge the constitutionality of 28 C.F.R. § 540.13, promulgated by the Bureau of Prisons.[1] Plaintiff claims that the regulation in question violates his First Amendment rights with respect to the reading of his general correspondence.[2] Plaintiff seeks injunctive relief and has moved pursuant to the Federal Rules of Civil Procedure 12(c) for a judgment on the pleadings or, alternatively, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant has cross-moved for summary judgment.

In a previous Opinion, this Court denied defendant's motion to dismiss for failure to state a claim for which relief could be granted, noting that the issues there discussed "require[d] further legal and factual development." *Heimerle v. Attorney General,* 558 F.Supp. 1292, 1296 (S.D.N.Y. 1983). We believe that summary disposition of this case is now appropriate in light of the expanded record before us and in light of the changes in the mail handling procedures that have occurred at the Otisville prison since our last Opinion was rendered.

## FACTS

The plaintiff is a prisoner at a federal correctional institution in Otisville, New York ("Otisville"). Plaintiff challenges the general authority granted to prison personnel under C.F.R. § 540.13 to read incoming and outgoing general correspondence. The plaintiff contends that the regulation and its implementation are violative of his First Amendment rights. Plaintiff does not allege specific acts of arbitrariness or unreasonableness on the part of prison officials and staff. Nor is there a claim that "special correspondence" is being opened.

At the time Heimerle filed this action, outgoing general correspondence was routinely opened and read by prison mail room staff. After the plaintiff filed this action, the security level of the prison, F.C.I. Otisville, New York ("Otisville"), was changed from "level 4" to "level 3" for the purpose of implementing the Bureau of Prisons regulations.[3] As a result of this change, outgoing general correspondence may be sealed by the inmate, and is not subject to being read on a "routine" basis, but only where there is reason to believe that the particular item of correspondence would be threatening to the recipient or would facilitate criminal activity, or if the correspon-

---

1. The relevant part of 28 C.F.R. § 540.13 states:
   (b) Institution staff shall open and inspect all incoming general correspondence. Incoming general correspondence may be read as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate.
   (c) Outgoing mail in Security Level 1, 2, 3 and of pretrial detainees in all institutions may be sealed by the inmate and is sent out unopened and uninspected. Staff may open an inmate's outgoing general correspondence:
   (1) If there is reason to believe it would interfere with the orderly running of the institution, that it would be threatening to the recipient, or that it would facilitate criminal activity;
   (2) If the inmate is on a restricted correspondence list; or
   (3) If the correspondence is between inmates.

   (d) Outgoing mail in Security Level 4, 5, and 6 and administrative institutions, except "special mail," may not be sealed by the inmate and may be inspected and read by staff.

2. Prisoner mail is divided into two categories, "Special Mail" and "General Correspondence." Special mail includes correspondence to or from federal and state officials, news media, representatives and legal offices (*i.e.* State Attorneys General, Prosecuting Attorneys, Legislators, Probation Officers, U.S. and State Courts). See 28 C.F.R. § 540.2(c). General correspondence includes all other incoming and outgoing mail that is not designated as "special." See C.F.R. § 540.2(a).

3. Correctional institutions are classified on a scale of security levels, which range from I to VI. I represents the least secure and VI represents the most secure.

dence is between inmates. *See* July 25, 1983 affidavit of Z. Stephen Grzegorek, Regional Director, Northeast Region, Federal Bureau of Prisons ("Grzegorek aff.") ¶ 4; *and see* 28 C.F.R. § 540.13.

Prior to opening incoming general correspondence, Otisville officials are required, under 28 C.F.R. § 540.13, to obtain prisoners' permission to do so. Prisoners can choose not to sign a waiver form which permits authorized staff to open, inspect and read incoming general correspondence, but in doing so, they forfeit their right to receive their mail.

In response to this Court's suggestion, the General Counsel of the Bureau of Prisons, Clair Cripe, has proposed instructions for guiding the prison mail room staff in reading mail. The Mail Management Manual, which contains these instructions, "will be distributed to each administrative systems manager (who supervises those having responsibility for inspecting and reading inmate mail) and to each mail officer within the Bureau." See Affidavit of Clair Cripe, Appendix A hereto.

The Mail Management Manual proposed by the Bureau of Prisons will be distributed to prison personnel who handle mail and will be used in their training. This manual informs prison personnel of their duty to maintain the confidentiality of the correspondence they read. In instances where mail room staff read mail and determine that it may pose a threat to security, the manual instructs such personnel to disclose this information to the appropriate prison officials.

## DISCUSSION

### A. *Outgoing Mail*

As previously noted, the redesignation of the security level at Otisville means that prisoners' outgoing mail is no longer subject to routine scrutiny. Since plaintiff has sought only injunctive relief with respect to this issue, his claims are hereby dismissed as moot.

### B. *Incoming Mail*

In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court held that regulations promulgated by the California Department of Corrections regarding censorship of prisoners' mail constituted a violation of the First Amendment rights of prisoners and their correspondents. However, in so holding, the Court set forth a two-pronged test for evaluating such regulations. Under this test, mail censorship is constitutionally permissible if:

(1) [it furthers] one or more of the important and substantial governmental interests of security, order and rehabilitation.

(2) [it is] no greater than is necessary or essential to the protection of the particular governmental interest involved. *Id.,* at 413, 94 S.Ct. at 1811.

In *Martinez*, the regulations promulgated by the Director of the California Department of Corrections were not justified by a legitimate governmental interest. Specifically, they prohibited inmate correspondence that "unduly complain[ed]," "magnif[ied] grievances," expressed "inflammatory political, racial, religious or other views" or contained "matter deemed 'defamatory' or 'otherwise inappropriate.'" *Id.* at 415, 94 S.Ct. at 1812. The Supreme Court affirmed a District Court determination that the regulations in question were "without adequate justification" and "were void for vagueness." *Id.* at 400, 94 S.Ct. at 1805.

We note at the outset that this case is distinguishable from *Martinez* in that the practice at issue here involves only the reading of mail as opposed to censorship. However, even the reading of mail implicates First Amendment interests because it exerts a potentially chilling effect upon the freedom of expression of the inmates and their correspondents. We will therefore assume that *Martinez* standards are applicable to this case. *See Finney v. Arkansas Board of Correction,* 505 F.2d 194, 210–11 (8th Cir.1974).

The first prong of test established by the Supreme Court in *Martinez* requires that mail censorship (here mail reading) further "one or more of the substantial governmental interests of security, order, and rehabilitation." 416 U.S. at 413, 94 S.Ct. at 1811. In evaluating the importance and substantiality of the government's interests in these regulations, we must also be guided by the Supreme Court's opinion in *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), which noted that courts should defer to the expertise of prison administrators absent "substantial evidence in the record to indicate that the officials have exaggerated their response" to legitimate concerns. *Id.* at 827, 94 S.Ct. at 2806. See also *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

The weight and legitimacy of the government's interest in monitoring incoming prisoner correspondence is not reasonably subject to doubt, especially under the *Pell* standard. Letters coming into the prison from the outside may contain narcotics, money, and other forms of contraband, or plans for escapes, riots, or other breaches of security. (Grzegorek Aff. ¶¶ 4, 5, 7–9).

Plaintiff argues that a lack of legitimate governmental interest is evidenced by the fact that Otisville officials do not closely monitor inmate social visits. Thus "any written material that could enter the prison through the mails could be transmitted just as easily in a conversation during a social visit." (Memorandum of Law at p. 9). Accepting the factual premise that social visits are not monitored (which the government disputes), and although we previously expressed doubt on this question, 558 F.Supp. at 1295, we do not believe that this argument can be maintained. Decisions regarding the necessity for, or efficacy of, different surveillance procedures are uniquely within the competence of prison administrators. So long as the challenged practice furthers a plausible security interest in a rational way, the first part of the *Martinez* test is satisfied.

The real substance of the plaintiff's claim is that the challenged regulations violate the second prong of the *Martinez* test in that they are "greater than necessary to further the legitimate governmental interest involved." 416 U.S. at 413, 94 S.Ct. at 1811. Plaintiff contends that instead of reading mail, prison officials should simply open and inspect it. While this procedure might be effective as to concealed contraband, it would obviously not be sufficient to detect plans for, or evidence of, the commission of illegal activities. Experience at Otisville has demonstrated the importance of the mail reading procedure.

> [W]e have detected threats against staff, against public officials, including judges, by references to such conduct in incoming general correspondence. We have detected mail fraud by inmates (ordering subscriptions to magazines, financial services, etc., without an intention to pay) and extortion plots by references to [sic] incoming mail to the inmates involved.

(Grzegorek Aff. at ¶ 8). As previously noted, in response to this Court's suggestion, the General Counsel of the Bureau of Prisons has proposed instructions to the prison staff with respect to the reading of inmate correspondence. (See Appendix A hereto). These guidelines provide at least some protection for the First Amendment and privacy interests of the prisoners and their correspondents.

Our conclusion is supported by a recent decision by the Sixth Circuit which upheld Bureau of Prisons Regulation 540.13 in the face of constitutional challenge. *Meadows v. Hopkins*, 713 F.2d 206 (6th Cir.1983). Counsel for the plaintiff does not seek to distinguish *Meadows*, but rather argues that it was wrongly decided. We believe, however, that *Meadows* is consistent with the law of this Circuit, at least with respect to the reading of *incoming* mail. See Judge Sweet's excellent survey of the relevant case law in *Golden v. Coombe*, 508 F.Supp. 156, 159–60 (S.D.N.Y.1981).

Plaintiff cites *Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1975) and *Gray v.*

*Creamer,* 376 F.Supp. 675 (W.D.Pa.1974) as support of his contention that it is appropriate for prison personnel to open and inspect mail, but that it is constitutionally impermissible for them to read it. Plaintiff's reliance on these cases is misplaced. The *Gray* and *Gates* courts upheld the procedure of opening and inspecting incoming (and outgoing) mail, for the purpose of detecting contraband. However, the courts did not address the constitutionality of reading incoming general correspondence, which is at issue here. Indeed, in a previous opinion, the *Gates* court had concluded that "incoming mail may be read to frustrate escape plans or other illegal activity." 349 F.Supp. 881, 896 (N.D.Miss.1972).

One final argument of the plaintiff deserves comment. He contends that he has been a "model prisoner" during his confinement and that restrictions that might be applicable to other, more dangerous inmates should not be imposed upon him. This claim was originally raised when Otisville was rated a security level 4 institution while Heimerle was classified as a level 3 inmate. Since then, as previously noted, Otisville has been reclassified as level 3. Thus, the plaintiff is now subject to restraints commensurate with his classification status. We believe that practical administrative considerations preclude a requirement of further individualized consideration of his case by prison officials.

Moreover, quite apart from the administrative burden that would be imposed by prescribing different mail monitoring procedures for different inmates of the same classification level, there is the possibility that prisoners who are not themselves security risks could become potential conduits, perhaps even unwillingly, for other prisoners. According to Mr. Grzegorek:

> We have seen instances where criminally sophisticated inmates, with long histories of criminal conduct inside as well as outside our institutions, threaten, intimidate, and attempt to use the less sophisticated inmate in the institution in their schemes to violate the contraband laws or facilitate passing of escape plans. While the less sophisticated inmate may pose a less serious threat to commit a crime while in the prison facility by himself, he poses to us a person other inmates may use through intimidation and threat.

Grzegorek Aff. ¶ 12.

We are not unmindful that our decision today allows the government to intrude into the privacy and First Amendment interests of the plaintiff to an extent that would not be tolerated for unincarcerated persons. However, as the Supreme Court has admonished on numerous occasions, all claims of constitutional right asserted by prisoners "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Therefore, under the circumstances of this case, the government's interest, on balance, must prevail.

Accordingly, plaintiff's motion is denied on the ground that (1) the issue regarding outgoing mail is moot and (2) the promulgation and implementation of the regulation in question, C.F.R. § 540.13, is constitutionally sound in light of the two-fold test established in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. Defendant's motion for summary judgment is granted.

SO ORDERED.

### APPENDIX A

### AFFIDAVIT OF CLAIR CRIPE

CLAIR CRIPE, declares, under penalty of perjury, as follows:

1. I am General Counsel of the United States Bureau of Prisons ("the Bureau"). It is my responsibility in this position to advise the Director of the Bureau and the heads of various offices within the Bureau regarding the legality of current and proposed practices, and to render counsel in connection with legal actions in which the Bureau is involved. I am personally familiar with the subject matter of the above-captioned civil action, and with the facts and circumstances recited herein, and make

this affidavit in support of the defendants' pending cross-motion for summary judgment.

2. The Bureau is planning to promulgate within the next several months a Mail Management Manual ("the Manual") which will serve as a compendium of all Bureau policy and procedures relating to the processing of both inmate and official mail. The Manual, once promulgated, will be distributed to each Administrative Systems Manager (who supervises those having responsibility for inspecting and reading inmate mail), and to each mail officer within the Bureau.

3. I am advised by the Assistant United States Attorney representing the Government in this action that the Court has expressed concerns relating to the training of those assigned to read such inmate correspondence as is subject to being read consistent with the provisions of 28 C.F.R. § 540.13, and—specifically—the extent to which such staff members are aware of their obligation to maintain the confidentiality of intimate information concerning the private lives of inmates or their correspondents. While we have no knowledge of any instance where the lack of judgment of any staff member in this regard has posed a problem, we do appreciate the delicacy of the interests involved, and can appreciate the court's desire to ensure that those staff members bearing responsibility for mail review are aware of the need for sensitivity and discretion. In that connection, we propose to include the following paragraphs in the Manual:

> Consistent with the provisions of Bureau of Prisons regulations codified at 28 C.F.R. § 540.13, incoming general correspondence and outgoing mail in Security Level 4, 5 and 6 institutions (except "special mail") is subject to random reading by correctional staff. The objectives to be accomplished in reading incoming or outgoing mail differ from the objectives of *inspection*. In the case of *inspection* (to which *all* incoming general correspondence is subjected), the objective is primarily to detect contraband. The random *reading* of mail is intended to reveal (for example) escape plots, plans to commit illegal acts, or plans to violate institution rules or other security concerns.

> In the course of reading correspondence a staff member may incidentally learn of intimate information concerning the private lives of inmates or their correspondents. We must be sensitive to the fact that most information in correspondence is of a private nature, and must be handled discreetly. Unless there is a legitimate correctional concern relating to security, safety, orderly running of the institution, criminal activity, or inmate rehabilitation, the contents of reviewed correspondence should not be revealed to any other person.

Inasmuch as the Manual will be available to Bureau staff responsible for handling inmate mail, and will in fact be used in their training, it is my hope that inclusion of the foregoing paragraphs will serve to address in an adequate manner the pertinent concerns expressed by this Court.

/s/ Clair Cripe  
CLAIR CRIPE

New York, New York  
October 5, 1983